IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| ITT CORPORATION,<br>　　　Plaintiff/ Counter-Defendant, | Civil Action No. 1:05-CV-0674 |
| vs. | Honorable Robert Holmes Bell |
| BORGWARNER INC.,<br>KUHLMAN CORPORATION,<br>BRONSON SPECIALTIES INC.,<br>　　　Defendants/Counter-Plaintiffs/Cross-<br>　　　Plaintiffs/Cross-Defendants | **Motion of Defendant Royal Oak Industries<br>for<br>(1) Summary Judgment on Plaintiff's<br>CERCLA Claim Relating to the NBFF<br>OU1 Site, and<br>(2) Dismissal of Plaintiff's State Law<br>Claims for Lack of Supplemental<br>Jurisdiction** |
| and | |
| ROYAL OAK INDUSTRIES, d/b/a<br>BRONSON PRECISION PRODUCTS,<br>　　　Defendant/Counter-Plaintiff/Cross-<br>　　　Defendant/Cross-Plaintiff | |
| and | **Oral Argument Requested** |
| THE SCOTT FETZER COMPANY,<br>　　　Defendants/Cross-Defendant/Cross-<br>　　　Plaintiff | |

Defendant Royal Oak Industries moves for (1) summary judgment under Fed. R. Civ.

P. 56 on Plaintiff's CERCLA claim relating to the NBFF OU1 site, and (2) dismissal of

plaintiff's state law claims for lack of supplemental jurisdiction. Royal Oak Industries

requested concurrence from plaintiff, but plaintiff did not concur in this motion.

|  |  |
|---|---|
| | **BEIER HOWLETT, P.C.** |
| May 22, 2008 | /s/ Jeffrey K. Haynes　　　　　　 |
| | Jeffrey K. Haynes (P25140) |
| | Keith C. Jablonski (P62111) |
| | Attorneys for Defendant Royal Oak Industries |
| | 200 E. Long Lake Road, Ste. 110 |
| | Bloomfield Hills, MI  48304 |
| | (248) 645-9400 (phone) |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ITT CORPORATION,
     Plaintiff/ Counter-Defendant,

Civil Action No. 1:05-CV-0674

vs.

Honorable Robert Holmes Bell

BORGWARNER INC.,
KUHLMAN CORPORATION,
BRONSON SPECIALTIES INC.,
     Defendants/Counter-Plaintiffs/Cross-
     Plaintiffs/Cross-Defendants

and

ROYAL OAK INDUSTRIES, d/b/a
BRONSON PRECISION PRODUCTS,
     Defendant/Counter-Plaintiff/Cross-
     Defendant/Cross-Plaintiff

and

THE SCOTT FETZER COMPANY,
     Defendants/Cross-Defendant/Cross-
     Plaintiff

**Brief in Support of Motion of Defendant
Royal Oak Industries for
(1) Summary Judgment on Plaintiff's
CERCLA Claim Relating to the NBFF
OU1 Site, and
(2) Dismissal of Plaintiff's State Law
Claims for Lack of Supplemental
Jurisdiction**

<u>**Oral Argument Requested**</u>

<u>**Introduction**</u>

Defendant Royal Oak Industries (ROI) moves for summary judgment pursuant to

F.R.C.P. 56 on plaintiff's sole remaining CERCLA claim relating to the site known as the

North Bronson Former Facilities Operable Unit One (NBFF OU1). ROI also moves this Court

to decline to exercise supplemental jurisdiction over plaintiff's state law claims under Part 201

of the Natural Resources and Environmental Protection Act, M.C.L. 324.20101 *et. seq.*, for

lack of a federal claim, if this Court grants ROI summary judgment on plaintiff's CERCLA

claim. There is no genuine issue of material fact that, although Bronson Precision Products

(the assumed name under which ROI operated at the NBFF OU1 site from 1985 to 1994)

released waste cutting oil on the ground at the site, BPP did not release any hazardous substance. BPP's cutting oil release does not create CERCLA liability, because waste cutting oil is not a hazardous substance under CERCLA's "petroleum exclusion". Since BPP released no hazardous substance during its tenure at the site, this Court should grant summary judgment on Plaintiff's CERCLA claim and decline to exercise supplemental jurisdiction over plaintiff's state law claims.

### Statement of Facts

The general facts concerning the NBFF OU1 site are not at issue and are described in the Record of Decision (ROD) for the site prepared by the United States Environmental Protection Agency (EPA) in September 2006 (Exhibit 1). The site comprises about 1.85 acres and contains a former manufacturing building and a storage building. The Bronson Reel Company and its successors manufactured fishing reels and other metal products, using metal plating, anodizing and machining operations, from 1929 to 1968. Plating operations stopped in 1969. Various companies, including BPP, machined small metal parts at the site after 1968 to the early 1990s. The plating lines included nickel, chromium, cadmium and cyanide plating lines. ROD at 1-2. Following an inspection by regulatory authorities in June 1988, the then-owner of the site, Kuhlman Corporation/(New) Bronson Specialties, Inc. removed over 10,000 tons of soil, comprising about 70 percent of the exposed soil, from the site, mostly to the water table. Kuhlman/New BSI removed an underground storage tank, an oil-water separator, and a portion of an industrial sewer. The Michigan Department of Natural Resources (DNR) oversaw this work. ROD at 2. In 2001, plaintiff received a special notice letter from EPA relating to NBFF OU1, after which plaintiff in 2002 signed an Administrative Order on

Consent with EPA to prepare a streamlined remedial investigation/streamlined remedial assessment (SRI/SRA) and a focused feasibility study. ROD at 2.

During 60 years of manufacturing at the site, cutting oils released on site carried fragments from the waste metal chips to the yard soil. The metal compounds generally did not reach deeper than five feet. The cutting oils moved more easily through the soil and reached the groundwater, where they are detected in groundwater as total petroleum hydrocarbons (TPH). The current extent of metals and TPH in soil at the site is around the periphery of the excavation next to fences and buildings. ROD at 3.

The SRI found that volatile organic compounds (VOCs) in the groundwater at the site, including trichloroethylene (TCE), are part of a regional groundwater plume that originates upgradient and east of NBFF OU1. ROD at 5-6. The SRI found nine metals in soil, including arsenic, beryllium, cadmium, chromium, copper, lead, mercury, nickel, and zinc, at concentrations below Michigan direct contact criteria for commercial/industrial sites. ROD at 6. The SRI found nine metals in groundwater that exceeded upgradient concentrations, including arsenic, total chromium, copper, iron, manganese, nickel, silver, total cyanide and zinc. ROD at 6.

The SRI concluded that the VOCs (including TCE) in groundwater at the site originated from off-site and that low concentrations of another VOC, PCE (tetrachloroethylene), are not a threat to groundwater. The SRI concluded that residual metals in the soil do not adversely affect groundwater. ROD at 8. The ROD identified no hazardous substances as contaminants of concern at the site. ROD at 11-13. The ROD selected a remedy of no action except a restrictive covenant to require further investigation if the building slab is removed and to prohibit the use of groundwater at the site. ROD at 17.

2

Depositions of fact witnesses in this action have concentrated on historic operations at the site.  What follows is a summary of the salient testimony of these witnesses as it relates to BPP's operations at the site.

*James Gerchow* (Exhibit 2).  Mr. Gerchow  started work at Bronson Specialties in 1971 (p8).  There was no plating of metals at Bronson Products when he started (p13).  The oil that was used on the screw machines at the plant was fed into a centrifuge that would remove about 90% of the oil from waste chips.  Before that time, the chips were never spun (p24). Grinding "swarf" was stored in totally sealed units (p30).  Other metal chips were stored on either side of an outside door of the building (p31).  There would be occasional runoff from those two chip boxes (p33).  Steel bar ends were stored outside with no oil on them in the southwest corner of the yard (p34).  Metals used for the screw machines and the other cutting machines were alloy steel (p35), some of which would contain a small amount of chromium (p37).  The fuel oil tank was not used after 1978 (p43).  Mr. Gerchow was vice president and general manager of the facility when BPP moved out of the facility in 1994 (p45).  Barrels were stored inside the plant from 1985 on (p63).  Safety Clean (sic: Kleen) was used to remove oleum spirits (naptha) from the site (p78).  The facility never used TCE when he was at the facility (p86).  Any runoff from the chip hoppers was contained in a containment area built in 1988 or 1990 (p101).  He was not aware of any releases of stored drums on the site (p108).  All the dirt around the chip hoppers was removed by a licensed hauler and replaced (p196).  BPP never used the oil-water separator (p202).  BPP never used cadmium, chrome, copper, nickel, zinc, arsenic or cyanide (p203).

His position is that the cleanup from BPP's operations would have been a very small area around the chip hoppers, not the entire backyard which had been used by Bronson Reel

3

from 1929 to 1968, with no chip containment at all, and where the chips were dumped fully loaded with oil and all the plating residue was dumped (p205). Brass shavings were packed in a 55-gallon drum (p229) and were stored inside (p230). The steel chips were essentially dry because one could pick the chips up and not really see any oil on one's hands (p232).

*Leonard Lipinski* (Exhibit 3). Mr. Lipinski was the project manager for the Michigan Department of Natural Resources for the Bronson Precision Products Site in 1988 to 1990 (p9). When he was at the site, he did not sample the cutting oils (p72). He did not know the volume of soil that may have been affected by the leaking cutting oils (p73). He does not know the source of the metal contamination at the site (p75).

*David Shafer* (Exhibit 4). Mr. Shafer's company performed the excavation at NBFF OU1 (pp15-17). He saw no evidence of leakage or any drums dripping (p137). He removed any obviously contaminated soils during the excavation (p174).

*Craig Laurent* (Exhibit 5). Mr. Laurent worked at the Branch-Hillsdale-St. Joseph County Health Department from 1981 to 1989 (p7). The DNR had inspected the BPP site in May 1988 (Exhibit 6); this inspection noted "evidence of oily runoff to the ground in several areas" and "pooled oil present on ground at one end of bin and evidence of long-time run unto the soil (facility in operation since about 1920's)". Mr. Laurent sent a letter to BPP dated June 22, 1988 (Exhibit 7) in which he stated that "all drums used for storage must not leak (¶4), cutting oil drainage from metal shavings storage must be contained and shall not be discharged to the ground (¶5), and all contaminated soils must be removed (¶6). It was not an unusual occurrence for him to visit such a site (p39). It was not important for his inspection to know the history of the facility (p40). He could not recall any discharges to the ground from possible waste drums (p42). He could only recall drums being stored inside the building

(p43).  It appeared to him that numerous spots of stained soils in the storage area looked historically like they had been going on for quite some time (p44).  After the excavation, there was no more evidence of stained soils (p46).  He was satisfied as far as he could see that all contaminated soils had been removed (p53).

*Alden Haynes* (Exhibit 8).  Mr. Haynes (no relation to undersigned counsel) started at Bronson Reel in 1944 or 1945 (p9).  He worked as a truck driver starting in 1949 (p13) in which he would carry out punch press scrap and shavings from the screw machines and those went out in the back yard into bins (p14).  The bins were located in the westernmost part of the yard, about 60 feet from the south fence; they looked like an open garage about 12 feet wide, and 8 feet high, with a roof, partitions and a cement floor (p16).  The chips that were placed in the bins were oily and the oil always ran off the concrete floor (pp17-18).  The chips were about an 1/8th of an inch long and paper thin (p19).  He worked at the plant until about 1968 (p20).  The oils used at the time were petroleum-based oils obtained from Standard Oil across the railroad from the factory (pp22-23).  Mr. Haynes identified a photograph taken of the plant in 1948 (and identified his car in the photograph) (p27) and also identified scrap aluminum, scrap brass and coal in the yard (pp28-29) (Exhibit 8A).  Near the end of his tenure at the plant, the plant used trichloroethylene (p30).  The sludge from the trichloroethylene was cleaned out and put in a paper barrel and taken to the dump; it was never dumped in the yard (p32).  The oleum spirits used at the plant were tossed out with the shavings and went out to the backyard (p33).  At least once a month Mr. Haynes would pick up seven to eight 55-gallon barrels of oil at Standard Oil, because a lot of the oil went out with the shavings (pp35-37).

Pursuant to this Court's amended case management order (Docket 177), the parties submitted expert reports on or about February 2, 2009.  Portions of the report of plaintiff's

expert, Daniel B. Stephens, is attached as Exhibit 9.  In his report, Dr. Stephens opines first that the former Bronson Reel Site (NBFF OU1) is not a source of significant, if any, chlorinated solvent, such as TCE, in groundwater beneath or surrounding the site (p39).  This opinion is consistent with the record that BPP never used TCE during its tenure at the site.  Dr. Stephens opines that hazardous substances were handled, stored and/or disposed of at the former Bronson Reel Site when the site was occupied by, among others, Bronson Precision Products (p52).  Dr. Stephens cites Table 10 (Exhibit 9) from his report that summarizes the standard composition of metals identified on blueprints that he "discovered" during a site visit in November 2008.  He opines that:

> Machining, grinding, and finishing of these metals would produce chromium, copper and lead, which are hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) in Section 302.4 of Title 40 Code of Federal Regulations (40 CFR) ***.  (pp52-53).

In his deposition (Exhibit 10), Dr. Stephens admitted that he has not taken any courses in metallurgy (p77).  He admitted that he did not investigate how much oil was used by the operations prior to 1969 and did not remember how much oil Mr. Haynes purchased on a monthly basis from Standard Oil in Bronson (p98).  He believed that significant amounts of hydrocarbon were found in the area of the chip bins on the southwest corner of the site prior to 1969 (p99).  He admitted in his deposition that machining, grinding, and finishing would not produce the elemental forms of chromium, copper or lead (p103); and he supposed that a high acidic solution would be used to extract elemental chromium, copper or lead from stainless steel (pp103-04).  He admitted that he was not aware of any process during Bronson Precision Products' tenure that created elemental chromium, copper, and lead that was found in the soil and groundwater at the NBFF OU1 site (p106).  He did not recall TPH as being a CERCLA

6

hazardous substance (p74). He later testified, in response to questions from plaintiff's counsel, that he believed that metals entrained in the oils that percolated through the soil would be subject to physical processes in the soil that would cause the metal particles to oxidize or weather (p272). He admitted that he was not sure how such an oxidation process would have happened at this site (p280). He admitted that he has not investigated such physical processes at the soil at this site (p280).

## Summary of Proceedings

Plaintiff filed this action for response costs against defendants after plaintiff allegedly incurred expenses in investigating two sites of contamination, Operable Unit 1 (OU1) of the North Bronson Former Facilities site (NBFF OU1) and Operable Unit 1 of the North Bronson Industrial Area (NBIA OU1). This Court dismissed plaintiff's CERCLA cost recovery claim on the ground that plaintiff, as a potentially responsible party (PRP), could not bring a cost recovery claim. This Court also dismissed plaintiff's contribution claim for failure to file within the applicable statute of limitations, and dismissed plaintiff's supplemental state law claims (Docket 61 and 62). On appeal, the Sixth Circuit affirmed the dismissal of plaintiff's contribution claim but reversed and remanded the dismissal of plaintiff's cost recovery claim in light of the Supreme Court's decision in *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007), which held that PRPs are not precluded from seeking to recover costs under CERCLA § 107(a), 42 U.S.C. § 9607(a). *ITT Industries, Inc. v. Borgwarner, Inc.* 506 F. 3d 452 (6th Cir. 2007).

Upon remand, plaintiff filed an amended complaint alleging cost recovery under CERCLA and companion claims under Part 201 of the Natural Resources and Environmental Protection Act, M.C.L. 324.20101 *et seq*. On the motions of several defendants, this Court

dismissed the CERCLA claim for NBIA costs (Docket 223), but did not address the validity of

plaintiff's state law claims (Docket 229).   What remains in this action, then, are plaintiff's

CERCLA claim relating to NBFF OU1 and plaintiff's state law claims under Part 201 relating

to NBFF OU1 and NBIA OU1.

## ARGUMENT

I.    **There is no genuine issue of material fact that Plaintiff's claim against Defendant
      Royal Oak Industries for the NBFF OU1 Site relates only to non-CERCLA
      hazardous substances; Defendant Royal Oak Industries should therefore be
      granted summary judgment on Plaintiff's CERCLA claim.**

The standard of review for motions for summary judgment is well settled:

> A court may grant a motion for summary judgment if the
> pleadings, depositions, answers to interrogatories and admissions
> on file, together with affidavits, if any, show that there is no
> genuine issue as to any material fact and that the moving party is
> entitled to judgment as a matter of law.  *City Management Corp. v.
> U.S. Chemical Co., Inc.,* 43 F.3d 244, 250 (6th Cir. 1994).  The
> court must view the facts presented in the light most favorable to
> the non-moving party, *Matsushita Electric Industries Co. v. Zenith
> Radio Corp.,* 475 U.S. 574, 587 (1986), and draw all reasonable
> inferences in the non-movant's favor, *Rakoczy v. Traveler's
> Insurance Co.,* 959 F. Supp. 777, 781 (E.D. Mich. 1997).  A party
> seeking summary judgment must specify the basis upon which
> judgment should be granted and identify that portion of the record
> which demonstrates the absence of a genuine issue of material fact.
> *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 800 (6th Cir.
> 1994).  If this burden is met, the non-moving party must provide
> facts, supported by evidence in the record, "upon which a
> reasonable jury could find there to be a genuine fact issue for
> trial."  *Bill Call Ford, Inc. v. Ford Motor Co.,* 48 F.3d 201, 205
> (6th Cir. 1995).

*Organic Chemical Site PRP Group v. Total Petroleum, Inc.,* 58 F. Supp. 2d 755, 759 (W.D.

Mich. 1999).

**A.    A CERCLA claim can relate only to hazardous substances defined by CERCLA.**

In order to prove a cost recovery action under CERCLA §107(a), a plaintiff must prove four elements:

> (1)    The property is a "facility".
> (2)    There has been a "release" or "threatened release" of a hazardous substance.
> (3)    The release has caused the plaintiff to incur "necessary costs of response" that are "consistent" with the NCP [National Contingency Plan].
> (4)    The defendant is in one of four categories of potentially responsible parties.

*Regional Airport of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006). Those four categories of potentially responsible parties (PRPs) include (1) the present "owner and operator" of a facility; (2) a person "who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of"; (3) a person who "arranged for disposal" of hazardous substances owned or possessed by such person; and (4) a person who transported hazardous substances to a facility selected by the transporter. 42 U.S.C. § 9607(a).

Before CERCLA liability may be imposed, plaintiff must demonstrate that a "hazardous substance", as defined by CERCLA, is involved. 42 U.S.C. § 9607(a). CERCLA provides a long definition of the term "hazardous substance":

> (14) The term "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of

9

> the Federal Water Pollution Control Act [33 U.S.C. 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C. 2606]. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14). CERCLA's definition of hazardous substances expressly excludes petroleum, which is known as the "petroleum exclusion".

In order for liability to attach to a former owner or operator, 42 U.S.C. § 9607(a)(2), plaintiff must show that the person owned or operated the facility "at the time of disposal of any hazardous substance". *Id.* The term "disposal" is defined by CERCLA as "the meaning provided in section 1004 of the Solid Waste Disposal Act [42 U.S.C. 6903]." 42 U.S.C. § 9601(29). The Solid Waste Disposal Act defines "disposal" as:

> [T]he discharge, deposit, injunction, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).

Thus, in order to prove liability against a former owner or operator under 42 U.S.C. § 9607(a)(2), a plaintiff must show that (1) the person "owned or operated" the facility (2) "at the time of disposal" of (3) "any hazardous substance" at the facility. In other words, a former owner or operator can be liable if and only if the person owned or operated the facility contemporaneously with the disposal of a hazardous substance. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985).

1.      **Waste cutting oil by itself is not a CERCLA hazardous substance.**

It has long been recognized that waste cutting oil, as a form of oil or petroleum, is specifically excluded from CERCLA's definition of the term hazardous substance pursuant to the petroleum exclusion. *Marmon Group, Inc. v. Rexnord, Inc.*, 1986 U.S. Dist. Lexis 24122 (N.D. Ill. June 6, 1986) (Exhibit 11), reversed on other grounds 822 F.2d 31, 33, 34 (7th Cir. 1987) (recognizing dismissal of the CERCLA count, but reinstating the indemnity count of plaintiff's complaint). The petroleum exclusion does not apply to hazardous substances which are added to petroleum products during use. *Organic Chemicals Site PRP Group v. Total Petroleum, Inc.*, 58 F. Supp. 2d 755, 763 (W.D. Mich. 1999) (citing cases). Thus, Royal Oak Industries' use of cutting oil would not make it subject to CERCLA liability except if its waste cutting oil contained hazardous substances.

2.      **CERCLA liability requires disposal of a hazardous substance identified in EPA regulations.**

A PRP can be held liable under CERCLA only if a hazardous substance is involved. The Environmental Protection Agency has compiled a list of the hazardous substances denominated by the various statutes cited in CERCLA's definition of hazardous substances in 42 U.S.C. § 9601(14). That list is found in the table contained in 40 C.F.R. § 302.4 (Exhibit 12). The regulation divides hazardous substances into two types: listed hazardous substances that appear in Table 302.4, 40 C.F.R. § 301.4(a), and unlisted hazardous substances, which are defined by 40 C.F.R. § 302.4(b) as:

> A solid waste, as defined in 40 CFR 261.2, which is not excluded
> from regulation as a hazardous waste under 40 CFR 261.4(b), is a
> hazardous substance under section 101(14) of the Act if it exhibits
> any of the characteristics identified in 40 CFR 261.20 through
> 261.24.

40 C.F.R. § 302.4(b).

Table 302.4 contains several ambiguous listings, including: "chromium and compounds" (page 287), "copper and compounds" (page 287), "zinc and compounds" (page 300).  Several courts have noted this ambiguity, holding, by virtue of the plain language of the regulations, that the generic listing, e.g., "chromium and compounds", does not apply to all substances that contain chromium, copper or zinc.  In *United States v. Serafini*, 750 F. Supp. 168, 170 (M.D. Penn. 1990), the court granted summary judgment to a defendant who argued that polyvinyl chloride, which was an inert solid made by heating and mixing virgin polyvinyl chloride resin carbon black and a stabilizer, was not a listed hazardous substance in Table 302.4.  In *City of New York v. Exxon Corp.*, 744 F. Supp. 474, 487-488 (S.D. N.Y. 1990), the court was faced with the question of whether a defendant's waste oil emulsion, that contained compounds of lead, chromium and cadmium, contained hazardous substances.  The court found that not all chromium, lead and cadmium compounds are "listed hazardous substances" under 40 C.F.R. § 302.4(a).  *Id.* at 488.  The court's reasoning is instructive.  In interpreting the ambiguous phrase "chromium and compounds" in Table 302.4, the court looked to 40 C.F.R. § 302.4(b), which defines "unlisted hazardous substances" as those that exhibit the characteristics identified in 40 C.F.R. § 261.20 through 40 C.F.R. § 261.24.  Those characteristics are ignitability, corrosivity, reactivity and EP toxicity.  That is, for specific substances that are not listed in Table 302.4, the court concluded that one must turn to the characteristics of the waste identified in 40 C.F.R. § 261.20 through 40 C.F.R. § 261.24.  The court concluded that if "chromium and compounds" included all chromium compounds, it would never be necessary to apply 40 C.F.R. § 302.4(b) to determine whether or not a waste is EP toxic for chromium, and the reference in 40 C.F.R. § 302.4(b) to 40 C.F.R. § 261.24 would be meaningless for any waste that contain cadmium, chromium, or lead compounds.  The court

concluded that not all chromium, lead and cadmium compounds are "listed hazardous substances" under 40 C.F.R. § 302.4(a). *Id.* at 488.

### 3. The history of EPA hazardous substances regulations support an interpretation that not all unlisted compounds in Table 302.4 are CERCLA hazardous substances.

The holding in *City of New York v Exxon Corp.* is buttressed by a detailed analysis of the statutory and rule citations in Table 302.4. Table 302.4 identifies various attributes of the listed hazardous substances, including the specific CASRN (chemical abstracts service registry number), regulatory synonym, reportable quantity (RQ), and the statutory source for the hazardous substance (the statutory source identifies the statute listed in 42 U.S.C. § 9601(14) under which EPA has identified a hazardous substance). For the "compounds" listings, e.g., "chromium and compounds" (page 287), the statutory code is listed as "2,3". The note in 40 C.F.R. §302.4 says that "2" indicates that the statutory source is § 307(a) of the Clean Water Act and "3" indicates that the statutory source is § 112 of the Clean Air Act. EPA has listed toxic pollutants under § 307(a) of the Clean Water Act, 33 U.S.C. § 1317(a) (as identified in 43 U.S.C. § 9607(a)) in 40 C.R.F. 401.15. The list of toxic pollutants in 40 C.F.R. § 401.15 includes, among others, "chromium and compounds", "copper and compounds", and "zinc and compounds".

When EPA promulgated Table 302.4, it addressed the question of whether it considered releases of specific compounds within the generic classes could create liability. EPA said:

> Several commenters were unsure of the Agency's position on reporting and liability for generic classes. *** EPA has determined that the notification requirements need apply only to those specific compounds for which RQs are listed in Table 302.4, rather than to the generic classes of compounds. However, as the Agency indicated in the NPRM [notice of proposed rule making] preamble,

> this does not preclude liability with respect to releases of specific compounds which are within one of these generic listings but which are not listed in Table 302.4. In other words, a releaser is liable for the clean up of releases of hazardous substances which fall under any of the broad, generic classes, but does not have to report such releases when the specific compounds, and hence the RQs, are not listed in Table 302.4.

50 Fed. Reg. 13461 (Exhibit 13). In addition, EPA's preamble to the final rule indicates that the EPA would not require reporting of releases of "massive forms of the 12 solid metals originally listed under CWA section 307(a) when a diameter of the pieces of metals released equals or exceeds 100 micrometers (0.004 inches)." The agency also said that "it is extremely unlikely that a release of solid metal particles of 100 micrometers or larger will require a response". 50 Fed. Reg. 13461. In the preamble to the notice of proposed rule making, 48 Fed. Reg. 23555 (Exhibit 14), EPA noted that:

> Releases of these metals are excluded form [sic] CERCLA reporting requirements because they are large enough to be neither respirable nor to react rapidly with air or water. The substances to which this rule applies are indicated by a "+" in Table 302.4. They are antimony, arsenic, beryllium, cadmium, chromium, copper, lead, nickel, selenium, silver, thallium, and zinc.

Thus, EPA recognized that large forms of the metals listed as toxic substances pursuant to the Clean Water Act do not pose a threat to the environment.

The genesis of the phrase "*element* and compounds" (where "*element*" is cadmium, chromium, etc.) is found in EPA's publication of the toxic pollutant list at 43 Fed. Reg. 4108-4109 (Exhibit 15). In this Federal Register notice, EPA noted that nine of the 65 listed pollutants were previously listed as toxic pollutants in 1973 and that toxic pollutant effluent standards were promulgated for six of those nine. In 1973, EPA initially promulgated its list of toxic pollutants. 38 Fed. Reg. 24342-24344 (Exhibit 16). In response to the comment that the inclusion of "cadmium and all cadmium compounds" was over inclusive because relatively

14

innocuous forms of the element would be included, EPA said "The final effluent standards will distinguish among the various forms in which the element may occur."  38 Fed. Reg. 24343. Thus, EPA contemplated that, for instance, cadmium compounds that would be toxic would be included in final effluent limitations for toxic elements such as cadmium.

One would expect, then, for purposes of determining (a) whether the phrase "*element and compounds*" in Table 302.4 includes specific compounds of the particular element, such as chromium, copper or lead, and (b) the basis for the listing of "element and compounds" is the Clean Water Act, that one could look to EPA's toxic pollutant effluent standards to determine which of the compounds of the various metals EPA has determined to be toxic.  EPA, however, has listed toxic pollutant effluent standards for only six substances, those being aldrin/dieldrin, DDT and its compounds, endrin, toxaphene, benzidine, and PCBs.  40 C.F.R. § 129.100-129.105.  Thus, EPA has not promulgated toxic pollutant effluent standards for any of the metals and compounds listed in Table 302.4.  Therefore, EPA regulations do not support the idea that every compound of every elemental metal listed in Table 302.4 is a listed hazardous substance.

This reading of the generic terms in Table 302.4 is consistent with the concern recognized by the First Circuit in *Massachusetts v. Blackstone Valley Electric Co.*, 67 F. 3d 981 (1st Cir. 1995).  In *Blackstone Valley*, the question was whether a compound called ferric ferrocyanide (FFC) was a hazardous substance within the meaning of CERCLA.  The court identified the ambiguity of the listing in Table 302.4 of "cyanides" and described the phrase as ambiguous.  *Id.* at 987.  The court identified some compounds, such as vitamin B12, that contain cyanide, but that would not come within the meaning of hazardous substances under the Clean Water Act or CERCLA.  The court warned that a rule that defined "cyanides" to

include all substances that release any cyanide when subjected to the total cyanide test would be "untenably overinclusive". *Id*. at 990.

The union of one non-hazardous substance with another non-hazardous substance can yield only a non-hazardous substance of no concern to CERCLA. *Southern Pacific Transp. Co. v. California,* 790 F. Supp. 983, 986 (C.D. Cal. 1991) (petroleum mixed with soil is still subject to the petroleum exclusion). Thus, if, for instance, cutting oil is released with substances not listed in Table 302.4, such as water, stainless steel or brass, the release of such a mixture does not create a liability under CERCLA.

There is a temporal element for liability of a former owner and operator under 42 U.S.C. § 9607(a)(2). In *Organic Chemical Site PRP Group*, *supra*, the question was whether petroleum found in the soil at the facility that exceeded concentrations found in unused petroleum products were nevertheless subject to the petroleum exclusion. Judge Enslen of this Court found:

> CERCLA does not, by its terms, impose liability for disposal of non-hazardous substances which later become hazardous. 42 U.S.C. § 9607(a)(2) (making the owner or operator of a facility "at the time of the disposal of a hazardous substance" liable). To avoid the petroleum exclusion, the hazardous substances in a petroleum product must be elevated at the time of release. *See City of New York v Exxon Corp.*, 766 F. Supp. 177, 187 (S.D. N.Y. 1991); [*United States v.*] *Western Processing Co.*, 761 Fed. Supp. at 722.

58 F. Supp. 2d at 763-764.

> **B.      There is no genuine issue of fact that the only hazardous substance that Royal Oak Industries may have contributed to NBFF OU1 is total petroleum hydrocarbon (TPH), which is a non-CERCLA hazardous substance.**

Plaintiff's sole claim against ROI under CERCLA is as a former operator of the NBFF OU1 site pursuant to CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2). This Court should grant

ROI summary judgment because there is no genuine issue of fact that no hazardous substances were released at NBFF OU1 when BPP carried on the manufacturing operations at the site.

Discovery has revealed that (1) BPP did not use TCE, the principal concern of the SRI/SRA prepared by plaintiff (Gerchow dep p86, Exhibit 2); (2) BPP did not use cadmium, chromium, copper, nickel, zinc or cyanide (*id*. p203) which are the metals found in the soil and groundwater at the site (ROD p6, Exhibit 1); (3) BPP released waste cutting oils from the chip hoppers at the site (Gerchow dep p33, Exhibit 2); (4) metal chips from the stainless steel bar stock machined by BPP would likely flow into the soil with the cutting oils (Stephens report, page 272, Exhibit 10); (5) the brass used by BPP was packed in barrels inside the plant (Gerchow dep p229, Exhibit 2); (6) plaintiff has been able to identify only the waste metal chips and cutting oils as wastes disposed of on site (Stephens dep p99, Exhibit 10); (7) plaintiff has identified no process at BPP that produced the elemental metals, such as chromium, that appear in the soil and groundwater at the site (*id.* p106); (8) the best theory that plaintiff has found to link the manufacturing process at BPP with the metals found in the soil at the site is that the metals oxidize *after* they are in the ground (*id*. p272); and (9) plaintiff has done no on-site studies to support its "oxidation" theory (*id*. p280).

By itself, BPP's discharge of cutting oil does not create CERCLA liability pursuant to the petroleum exclusion. *Marmim Group*, *supra*. Plaintiff's sole theory is that the metal chips in the waste cutting oil contained hazardous substances. But as *City of New York v. Exxon Corp.* demonstrates, metal alloys that contain trace amounts of otherwise hazardous metals are not themselves hazardous substances without a showing that they have hazardous characteristics under 40 C.F.R. § 261.24. To do so would risk the overinclusiveness warned against in *Blackstone Valley*.

17

Plaintiff's theory that the steel alloys released with the waste cutting oils would "oxidize" into elemental metals runs afoul of *Organic Chemical*. *Organic Chemical* requires that liability for a former operator of a facility attaches only for operations at the time of disposal. Under CERCLA's definition of "disposal", the release during BPP's tenure occurred from the chip bins. Any change, under plaintiff's theory, of the alloys in the soil after the release does not create CERCLA liability.

There is no genuine issue of fact, therefore, that the metal alloys entrained in BPP's waste cutting oil are not hazardous substances. Thus, no hazardous substance was added to the cutting oil. Because the cutting oil is exempt under CERCLA's petroleum exclusion, BPP, therefore, released no hazardous substances and is not liable under CERCLA.

## II.    This Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

### A.    Plaintiff's Cost Recovery Claim Pursuant to Part 201 Relating to NBFF OU1.

#### 1.    The Exercise of Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367 is Discretionary.

Count II of plaintiff's complaint rests upon the provisions of M.C.L. 324.20101 (Part 201), and specifically seeks cost recovery pursuant to the provisions of M.C.L. 324.20126a. As this claim clearly is based upon state law, it is wholly within this court's discretion to decide whether this claim should be heard in this proceeding or dismissed without prejudice.

Fed. R. Civ. P. 12(h)(3) states: "If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." It is important to note that the above-cited rule provides that a lack of subject matter jurisdiction may be raised at any time, and the court is thus authorized to dismiss a claim under Rule 12.

18

In this case, plaintiff's state law claims for cost recovery on the NBFF site and for cost recovery and contribution on the NBIA site are before this court under the auspices of the court's supplemental jurisdiction, and specifically pursuant to the provisions of 28 U.S.C. § 1367. The "supplemental jurisdiction" statute states that a court has jurisdiction over:

> (a) [A]ll other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

The statute also provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

There is voluminous case law affirming the proposition that section 1367 confers upon the court clear discretion whether or not to exercise supplemental jurisdiction over state law claims brought in conjunction with other claims. "Our decisions have established that pendent jurisdiction 'is a doctrine of discretion, not of plaintiff's right' [*United Mine Workers v.*] *Gibbs*, 383 U.S. [715,] at 726 [(1966)], and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons, *id.* at 726-727." *City of Chicago v. Int'l College of Surgeons,* 522 U.S. 156, 173 (1997).

Or, as the seminal *Gibbs* case summarized the doctrine of supplemental jurisdiction: "District courts should deal with cases involving pendent claims in the manner that best serves the principles of the economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *Gibbs, supra*; *City of Chicago, supra.*

Likewise, the Western District of Michigan has adopted the rationale of *Gibbs* and its progeny relative to the discretionary aspect of section 1367: "A federal district court may exercise pendent jurisdiction over state law claims if it (1) has the authority to hear the claims, and (2) determines, in its discretion, that the exercise of jurisdiction over the claims will further the policy goals of pendent jurisdiction." *Gibbs, supra; Bodenner v. Graves,* 828 F. Supp. 516 (W.D. Mich. 1993).

In *Williams v. Van Buren Twp.*, 925 F. Supp. 1231 (E.D. Mich. 1996), the court declined to exercise supplemental jurisdiction over state law claims because they raised novel and complex issues of state law. Relying on 28 U.S.C. § 1367(c)(1), the court stated: "In short, this court believes that novel and complex issues of state law are raised by plaintiff's state law claims. Fundamental concepts of federalism and respect for the courts of the state of Michigan dictate that Michigan state courts be allowed to address these issues. It is the courts of the state of Michigan that are the experts in these matters." *Williams* at 1238.

Analyzing the issue in further detail, the court in *Williams* also minimized what is likely a common argument of a party opposing dismissal for lack of supplemental jurisdiction – that hearing similar federal and state law claims arising from the common set of facts promotes judicial economy. As the court stated:

> Recent litigation in the federal courts involving federal law claims together with pendent state law claims has caused procedural and substantive problems. Although the federal and state claims in this action arise out of the same factual situation, litigating these claims

> together may not serve judicial economy or trial convenience.
>
> Because federal and state law each have a different focus, and because the two bodies of law have evolved at different times and in different legislative and judicial systems, in almost every case with pendent state claims, the courts and counsel are unduly preoccupied with substantive and procedural problems in reconciling the two bodies of law and providing a fair and meaningful proceeding.
>
> The attempt to reconcile these two distinct bodies of law often dominates and prolongs a pre-trial practice, complicates the trial, makes the jury instructions longer, confuses the jury, results in inconsistent verdicts, and causes post-trial problems with respect to judgment interest and attorney fees. Thus, it appears that in many cases the apparent judicial economy and convenience of the parties' interest in the entertainment of pendent state claims may be offset by the problems they create.

925 F. Supp. at 1238.

Case law in Michigan and other jurisdictions also makes it clear that when a court has dismissed a party's federal claim or claims, it is logical that the court will then decline to exercise supplemental jurisdiction over the remaining state law claims. This was the scenario presented in *Boshaw v. Spartan Stores, Inc.*, 2005 U.S. Dist. Lexis 32265 (W.D. Mich. 2005) (Exhibit 17).

In *Boshaw*, Judge Enslen of this court issued an order declining to exercise supplemental jurisdiction over various state law claims that remained after dismissal of the plaintiff's federal claims, finding that "the state law claims are best left to the state courts in order for them, as a matter of comity, to determine matters of state law which may be controversial." *Id.* at 15.

Likewise, in *Allen v. City of Sturgis*, 559 F. Supp. 2d 837 (W.D. Mich. 2008), Judge Maloney of this court declined to exercise supplemental jurisdiction over state law claims after having dismissed the plaintiff's federal claims. The court stated, "Having disposed of Allen's

21

federal claim, the court exercises its discretion under 28 U.S.C. § 1367(C)(3) and declines supplemental jurisdiction over the claims which arise under state law.  *Moon v. Harrison Piping Supply,* 465 F. 3d 719, 728 (6th. Cir. 2006)."  *Id*. at 852.  Further citing *Moon*, the *Allen* court noted that a "federal court that has dismissed a plaintiff's federal law claim should not ordinarily reach the plaintiff's state law claims."  *Id.* at 852.

### 2.    Application to this case.

In this case, the court has already dismissed plaintiff's federal claim for cost recovery as to the NBIA OU1 site (Docket 224).  This motion contains a request for summary judgment as to plaintiff's federal cost recovery claim relative to the NBFF site.  Should the court grant summary judgment, ROI further requests that the court follow the rationale of many federal courts in finding that the dismissal of all of a plaintiff's federal claims should cause a court to dismiss that plaintiff's state law claims without prejudice, such that they may be brought in an appropriate state court.

Assuming, *arguendo*, that the court refuses to grant ROI's motion for summary judgment as to the federal cost recovery claims involving the NBFF site, plaintiff's state law claims for cost recovery pursuant to section 20126a and contribution pursuant to section 20129 should nevertheless be dismissed without prejudice such that a state court may hear them.

Subsection (c)(1) of section 1367 allows a district court to decline exercise of supplemental jurisdiction if a " claim raises a novel or complex issue of state law."  Here, plaintiff's claim seeking cost recovery under Part 201 as to the NBFF site does arise from the admittedly voluminous and somewhat tortuous factual scenario as plaintiff's claim under Count I of its amended complaint.  However, a cost recovery action under Part 201 is decidedly unique to Michigan state law.  Michigan has its own case law and precedent that

pertains directly to cost recovery claims under Part 201.  While it may be true that an action for cost recovery under CERCLA §107 and an action for cost recovery under Michigan's Part 201 can, in an appropriate setting, be adjudicated together, the more likely outcome in the instant case is the scenario painted by Judge Gadola's analysis in the *Williams* case, mentioned *supra*.

For example, in this case, just as in the scenario envisioned in *Williams*, it is likely that the trial will be complicated by competing pretrial and evidentiary issues on the federal and state claims, different and distinct precedents that have evolved at different times in different legislative and judicial systems, and distinct post-trial issues.  For these reasons, the claim for cost recovery as to NBFF OU1 under state law should be dismissed.

Subsection (c)(2) of section 1367 also favors dismissal of the plaintiff's state law claims.  That subsection authorizes dismissal of state law claims if they "substantially predominate over the claim or claims over which the district court has original jurisdiction." Here, the plaintiff's original amended complaint contained five distinct claims, and three of those five claims (the two cost recovery subcounts under Count II pertaining to both NBIA OU1 and NBFF OU1 and the contribution claim pertaining to NBIA OU1 only in Count III) are state law claims.  By virtue of this Court's order dated March 31, 2009, the plaintiff's CERCLA claim as to the NBIA site has been dismissed.  Thus, the plaintiff is now left with four distinct claims, with three of them being state law claims.  Based on this analysis, the court may, and should, exercise its discretion and find that the state law claims substantially predominate over the remaining federal claim and decline to exercise supplemental jurisdiction over those state law claims.

Lastly, section (c)(3) of section 1367 authorizes dismissal of pending claims if the district court has dismissed all claims over which it has original jurisdiction. As stated above, should the court grant the instant motion for summary judgment as to the CERCLA claim pertaining to the NBFF site, there will be no remaining federal claims, and subsection (c)(3) would apply.

As the foregoing analysis shows, the exercise of a court's supplemental jurisdiction is clearly discretionary. Federal courts have shown a strong propensity to dismiss pendent claims, especially where, as in this case, the federal claims have already been dismissed, and the remaining state law claims raise complex issues which are best resolved by a state court applying that state's jurisprudence.

**B.    This Court Should Likewise Dismiss Plaintiff's State Law Claims Related to the NBIA OU1 Site.**

Having already determined that the plaintiff's CERCLA claim asserted in Count I of its amended complaint should be dismissed, plaintiff is left only with two Part 201 state law claims relative to the NBIA OU1 site. In this circumstance, not only does the entire analysis cited above apply, but also the rationale of this court in *Allen*, *supra*, as well as the analysis in the *Boshaw* case (Exhibit 17) because all of plaintiff's federal claims related to the NBIA site have already been dismissed.

Furthermore, while plaintiff has alleged claims in Count III of its amended complaint seeking contribution under Part 201, the provisions of that statute are even more unique to Michigan jurisprudence than those found in the CERCLA cost recovery action. If this Court refuses to dismiss Count III, as it is authorized to do by section 1367, at trial there will likely be documentary evidence and testimony introduced that pertain solely to the Part 201 contribution claim. This in turn will result in a longer trial and further potential of confusion

24

of the issues presented.  The plaintiff's CERCLA claim relative to the NBIA site is no longer present; the plaintiff's two Part 201 state law claims relative to that site should not remain.

The stated goals of the *Gibbs* line of cases and the codification of that rule of law in 28 U.S.C. § 1367 is best served by dismissal of all plaintiff's state law claims so that those claims may be heard in a Michigan court applying Michigan case law and statutes.  Based on this authority, dismissal of plaintiff's state law claims is appropriate pursuant to Fed. R. Civ. P. 12(h)(3).

## Conclusion

For the foregoing reasons, defendant Royal Oak Industries requests this Court grant summary judgment on plaintiff's CERCLA claim relating to the NBFF OU1 Site, and dismissal of plaintiff's state law claims for lack of supplemental jurisdiction.


|                    | **BEIER HOWLETT, P.C.**        |
|--------------------|--------------------------------|
| May 22, 2008       | /s/ Jeffrey K. Haynes          |
|                    | Jeffrey K. Haynes (P25140)     |
|                    | Keith C. Jablonski (P62111)    |
|                    | Attorneys for Defendant        |
|                    | Royal Oak Industries           |
|                    | 200 E. Long Lake Road, Ste. 110|
|                    | Bloomfield Hills, MI  48304    |
|                    | (248) 645-9400 (phone)         |

s

## CERTIFICATE OF SERVICE

I, Jeffrey K. Haynes, hereby certify that on August 15, 2008, I electronically filed the foregoing documents with the Clerk of the Court using the WCF system, which will send notification of such filing to the following:

Scott D. Broekstra (P48984)
DYKEMA GOSSETT PLLC
Attorneys for Plaintiff
900 Monroe Avenue, NW
Grand Rapids, MI  49503

Steven C. Kohl (P28179)
WARNER, NORCROSS & JUDD LLP
Attorneys for Defendants Borgwarner,
Kuhlman Corp. and Bronson Specialties
2000 Town Center, Ste. 2700
Southfield, MI  48075

Stephen Q. Giblin
Jones Day
Attorneys for Defendant The Scott Fetzer Company
North Point, 901 Lakeside Avenue
Cleveland, OH  44114-1190

Charles M. Denton (P33269)
Barnes & Thornburg
Attorneys for Third Party Defendant LA Darling Co
300 Ottawa Avenue NW, Ste. 500
Grand Rapids, MI  49503-2311

                                        **BEIER HOWLETT, P.C.**

May 22, 2009                            /s/ Jeffrey K. Haynes
                                        Jeffrey K. Haynes
                                        Attorneys for Defendant
                                        Royal Oak Industries
                                        200 E. Long Lake Road, Ste. 110
                                        Bloomfield Hills, MI  48304
                                        (248) 645-9400 (phone)
                                        (248) 645-9344 (fax)
                                        jhaynes@beierhowlett.com