UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ITT CORPORATION, an Indiana corporation,

    Plaintiff,

v.

BORGWARNER INC., a Delaware corporation,
et al.,

    Defendants.
_____/

File No. 1:05-CV-674

HON. ROBERT HOLMES BELL

# **O P I N I O N**

This environmental clean-up case comes before the Court on the Bronson Defendants' (BorgWarner Inc., Kuhlman Corporation ("Kuhlman Delaware"), and Bronson Specialities Inc. ("New BSI")) and Plaintiff ITT Corporation's cross-motions for summary judgment. (Dkt. Nos. 245, 251.) For the reasons that follow, the Bronson Defendants' motion will be granted and Plaintiff's motion will be denied.

**I.**

This is an action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, and Part 201 of the Michigan Natural Resources and Environmental Protection Act (NREPA), Mich. Comp. Laws §§ 324.20101-324.20142, seeking recovery of claimed response costs at two operable units within the EPA-regulated North Bronson Area Superfund site in Bronson, Michigan. The two operable units

at issue in this case are Operable Unit One ("OU1") of the North Bronson Former Facilities Site ("NBFF OU1 Site") and OU1 of the North Bronson Industrial Area Site ("NBIA Site").

The NBFF OU1 Site was developed by the Bronson Reel Company in 1929 for the manufacture of fishing reels. Higbie Manufacturing Company owned the Bronson Reel Company and the NBFF OU1 property until 1963, when it sold the Bronson Reel Company Division and the NBFF OU1 property to Bronson Specialities, Inc. ("Old BSI"). Plaintiff ITT is the successor corporation to Higbie Manufacturing Company.

New BSI had a manufacturing operation at the NBFF Site from 1979 to 1984. New BSI discontinued all manufacturing operations in 1990, but it is still the owner of the NBFF OU1 Site. New BSI is a wholly-owned subsidiary of Kuhlman Delaware, and Kuhlman Delaware is a wholly-owned subsidiary of BorgWarner.

Plaintiff has alleged that Defendant New BSI is the current owner and operator of the NBFF OU1 Site, and that it is the successor-in-interest to Old BSI and Bronson Products Company, former owners/operators of the NBFF OU1 Site from 1963 through 1979. (Dkt. No. 88, Am. Compl. ¶ 6.) Plaintiff has alleged that Defendant Kuhlman is a former operator of the Site, and that it owns and controls New BSI. (*Id.* at ¶ 7.) Plaintiff has alleged that Defendant BorgWarner is the successor-in-interest to and owner of Kuhlman, that it owns and controls BSI, and that it is a current operator of the Site. (*Id.* at ¶ 9.)

Currently before the Court are the Bronson Defendants' motion for partial summary judgment on Plaintiff's claim that New BSI succeeded to Old BSI's CERCLA and Part 201

liabilities relative to the NBFF OU1 and NBIA Sites, and the Bronson Defendants and Plaintiff ITT's cross-motions for summary judgment on whether Kuhlman and BorgWarner are liable under CERCLA and Part 201 at both the NBFF OU1 Site and the NBIA Site under theories of direct or derivative liability.[1] Defendant Scott Fetzer joins in ITT's opposition to the Bronson Defendants' motion for summary judgment. (Dkt. No. 263.)

## II.

The Bronson Defendants have moved for partial summary judgment that New BSI has not succeeded to any claimed CERLCA or Part 201 liabilities of Old BSI.

Plaintiff has conceded that it cannot show that there was a *de facto* merger of Old BSI with Kuhlman and/or its subsidiary New BSI, and that there is no evidentiary basis for finding successor liability on the part of New BSI at the NBFF OU1 Site. (Dkt. No. 260, ITT's Opp'n 16.) *See Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 314 (Mich. 2004) (describing the scope of successor liability and the elements of a *de facto* merger).

Accordingly, the Court will grant partial summary judgment to New BSI, that it has not succeeded to any claimed CERLCA or Part 201 liabilities by reason of its purchase of certain assets relating to the NBFF OU1 Site on January 26, 1979. This ruling does not affect New BSI's potential liability for Old BSI's orphan's share, i.e., the equitable share of the amount of response costs that are attributable to bankrupt or financially insolvent potentially

---

[1] Plaintiff has acknowledged that the corporate issues addressed in the Bronson Defendants' motion for summary judgment on all claims against BorgWarner and Kuhlman "apply equally to the Part 201 claims and CERCLA claims, as well as the NBIA Site and NBFF Site." (Dkt. No. 260, Pl.'s Opp'n 4 n.1.)

3

responsible parties ("PRPs"). *See Charter Twp. of Oshtemo v. Am. Cyanamid Co.*, 898 F. Supp. 506, 508 (W.D. Mich. 1995) (Enslen, C.J.) (defining "orphan's share").

### III.

The Bronson Defendants also seek summary judgment on Plaintiff's contention that Kuhlman Corporation is directly liable to Plaintiff for New BSI's CERCLA and Part 201 liabilities at the NBFF OU1 Site based on Kuhlman's assumption of the environmental liabilities of New BSI in 1999 when New BSI became a wholly-owned subsidiary of Defendant Kuhlman Delaware.

Some background on the history of New BSI's ownership is essential to the Court's analysis. In 1979, Kuhl, Inc., a wholly owned subsidiary of Kuhlman, Inc. ("Kuhlman Michigan"), purchased the assets of Old BSI. Kuhl, Inc. subsequently changed its name to Bronson Specialties, Inc. ("New BSI"). (Dkt. No. 245, Exs. A, C, D.) In 1985, New BSI sold substantially all of its operational assets associated with the NBFF OU1 property, but not the NBFF OU1 property itself, to P.C. Industries, which changed its name to Bronson Precision Products, Inc. (a/k/a Defendant Royal Oak Industries). New BSI continued other manufacturing operations at other locations until June 1990, when it sold substantially all of its remaining assets. (Dkt. No. 265, Bronson Def.'s Opp'n, Ex. 1.) Although New BSI retained certain assets, including the NBFF OU1 property, New BSI had no ongoing operations after the 1990 sale of its assets.

4

In 1993 Kuhlman Michigan merged into Kuhlman Electric Corporation ("KEC"), a Delaware corporation. (Dkt. No. 245, Ex. I). As a result of this transaction, New BSI became a subsidiary of KEC, and KEC became a wholly-owned subsidiary of newly created Kuhlman Delaware. Kuhlman Delaware was engaged in the manufacture of industrial products and electrical products. On March 1, 1999, BorgWarner acquired Kuhlman Delaware as a wholly-owned subsidiary, but announced its intention to sell Kuhlman Delaware's electrical products businesses. (Dkt. No. 265, Ex. 3, BorgWarner 3/19/1999 10-K.) In August 1999 BorgWarner sold KEC to a third-party. (Dkt. No. 245, Ex. J.) However, certain of KEC's assets, including New BSI, were excluded from the sale, and KEC assigned its right, title and interest in those excluded assets to Kuhlman Delaware. (*Id.*) As a result of this transaction, in 1999 New BSI became a wholly owned subsidiary of Kuhlman Delaware, which was a wholly owned subsidiary of BorgWarner.

Plaintiff contends that Kuhlman Delaware should be held liable for New BSI's environmental liabilities based on its assumption of New BSI's environmental liabilities. This assumption is based on two false premises.

First, Plaintiff erroneously assumes that it is in a position to enforce the contract between Kuhlman Delaware and KEC. Plaintiff has not demonstrated that it was party to or a third-party beneficiary of the August 30, 1999 Assignment and Assumption Agreement between Kuhlman Delaware and KEC that purportedly contained a contractual promise to assume liabilities. (Dkt. No. 251, Ex. 5, 10/5/1999 Assignment and Assumption Agrm't.)

Michigan's third-party beneficiary statute "draws a distinction between intended third-party beneficiaries who may sue for a breach of a contractual promise in their favor, and incidental third-party beneficiaries who may not." *Brunsell v. City of Zeeland*, 651 N.W.2d 388, 390 (Mich. 2002) (citing Mich. Comp. Laws § 600.1405). "A person is a third-party beneficiary of a contract only when that contract establishes that a promisor has undertaken a promise directly to or for that person." *Schmalfeldt v. North Pointe Ins. Co.*, 670 N.W.2d 651, 654 (Mich. 2003) (citing Mich. Comp. Laws § 600.1405; *Koenig v. South Haven*, 460 Mich. 667, 677, 597 N.W.2d 99 (1999)). "[A] court should look no further than the form and meaning of the contract itself to determine whether a party is an intended third-party beneficiary within the meaning of 1405." *Id.*

Plaintiff has not shown that it was referred to in the Agreement or that it was an intended beneficiary of the Agreement. Accordingly, ITT has no basis to assert any rights or claims for assumption of New BSI's liabilities arising out of that agreement.

Second, even if Plaintiff had standing to enforce the Assignment and Assumption Agreement, Plaintiff is not correct in its assertion that Kuhlman Delaware assumed New BSI's liabilities in that agreement. ITT relies on the following language from the agreement as the basis for its assertion that Kuhlman Delaware is liable for New BSI's obligations:

> Assignee [Kuhlman Corporation] hereby assumes, and agrees to pay, perform and discharge when due, all obligations and liabilities of Assignor [Kuhlman Electric Corporation] to be performed under the Retained Liabilities, in each case from and after the Effective Date.

(Dkt. No. 251, Ex. 5.) There is no mention in the Agreement of any assumption of New BSI's liabilities. Plaintiff relies on the fact that Kuhlman assumed liabilities of KEC under the "Retained Liabilities," which includes certain liabilities associated with subsidiaries. However, Kuhlman Delaware only assumed those liabilities of the subsidiaries to the extent that KEC itself had liability for the subsidiaries. In order to read an assumption of New BSI's liabilities into the Agreement, the Court would have to ignore the separate corporate existence of New BSI. As discussed in Part V below, the Court finds no basis for doing so. For these reasons, the Court declines to find that Kuhlman Delaware is directly liable to Plaintiff based on its alleged assumption of New BSI's liabilities.

## IV.

The Bronson Defendants also seek summary judgment on Plaintiff's contention that BorgWarner is directly liable as an operator of the NBFF OU1 Site. Plaintiff contends that the evidence demonstrates that Borg Warner has exerted control over the NBFF OU1 Site to a level sufficient to hold it directly liable as an operator under CERCLA § 107(a)(1) and the corresponding provisions of Part 201.

CERCLA defines the term "operator" as "any person . . . operating" the facility. 42 U.S.C. § 9601(20)(A)(ii). Because of the "uselessness" of this definition, the term is given its ordinary and natural meaning, which, in the CERCLA context is as follows:

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to

pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998).

For operator liability to attach under CERCLA, it is not enough that a corporate defendant actively participated in and exercised control over the general affairs of its subsidiary. *Id*. at 67-68. To be directly liable as an operator, a defendant must "manage, direct, or conduct operations specifically related to pollution." *Id.* at 66-67. Operator liability may attach "where a party's operational decisions, in conjunction with surrounding circumstances, contribute to a release." *United States v. Meyer*, 120 F. Supp.2d 635, 639 (W.D. Mich. 1999) (Enslen, C.J.). For operator liability to attach, the "surrounding circumstances" must link the defendant as an operator to the disposal of waste. *Aero-Motive Co. v. Becker*, No. 1:99-CV-384, 2001 WL 1699194, at *5 (W.D. Mich. Dec. 6, 2001) (Quist, J.)

Plaintiff has presented evidence that after purchasing Kuhlman in 1999, BorgWarner did nothing with the NBFF OU1 property for three years. BorgWarner, the grandparent corporation of New BSI, cannot be held liable as an operator for failing to act with respect to New BSI's property. "Before one can be considered an 'operator' for CERCLA purposes, one must perform affirmative acts. The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator." *United States v. Twp. of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998).

Plaintiff has also presented evidence that since 2002, BorgWarner has put up a fence around the property, arranged for Bronson Precision Products to remove its property, has provided ITT entry to the property to perform its work, has been the point person for ITT's and the EPA's contact, and has used its legal department to review access agreements.

BorgWarner's role in facilitating access to the NBFF OU1 site for remediation activities by ITT and other third parties does not qualify as managing, directing or conducting operations specifically related to pollution. *See Datron, Inc. v. CRA Holdings, Inc.*, 42 F. Supp. 2d 736, 747 (W.D. Mich. 1999) (Bell, J.) (granting summary judgment to a parent corporation on similar evidence). The Court concludes that BorgWarner cannot be held liable as an "operator" of the NBFF OU1 under CERCLA.

## V.

Plaintiff also contends that BorgWarner and Kuhlman Delaware have derivative liability for New BSI's environmental liabilities because the veil between BorgWarner and Kuhlman Delaware and New BSI must be pierced.

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *Bestfoods*, 524 U.S. at 61 (quotations omitted). "[N]othing in CERCLA purports to reject this bedrock principle . . . ." *Id.* at 62. "[W]hen (but only when) the corporate veil may be pierced, may a parent

corporation be charged with derivative CERCLA liability for its subsidiary's actions." *Id.* at 63-64 (footnote omitted).

A question left unresolved by *Bestfoods* is what law should be applied to the issue of piercing the corporate veil.[2] Plaintiff contends that the Court should apply federal common law to this issue. *See United States v. Gen. Battery Corp.*, 423 F.3d 294, 303-04 (3d Cir. 2005) (holding that successor and veil-piercing liability issues are governed by federal common law). Subsequent to the *Bestfoods* decision, the Sixth Circuit reaffirmed its position that it applies state law rather than federal common law in resolving liability issues relating to corporations and officers. *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 847 (6th Cir. 1999); *see also Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 515 (6th Cir. 2005) (observing that "[t]his Circuit similarly has declined to create federal common law and held that state common law provides the relevant standards for successor liability in a CERCLA action").

Plaintiff contends that if state law is to be applied, the Court should apply the law of Delaware because that is the state where Kuhlman and BorgWarner are incorporated. The Bronson Defendants contend the Court should apply Michigan law because that is where

---

[2]"There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing. . . . [However,] the question is not presented in this case, and we do not address it further." *Bestfoods*, 524 U.S. at 63-64 n.9.

10

New BSI is incorporated, and it is the New BSI corporate veil that ITT is attempting to pierce.

Courts in this circuit have generally applied the law of the forum state in their veil-piercing analysis. *See Donahey v. Bogle*, 129 F.3d 838, 843 (6th Cir. 1997) (applying Michigan doctrine of veil piercing because case arose in Michigan), *vacated on other grounds*, 524 U.S. 924 (1998); *United States v. Cordova Chem. Co.*, 113 F.3d 572, 580 (6th Cir. 1997) (applying Michigan law to issue of whether to pierce the corporate veil), *vacated on other grounds sub nom United States v. Bestfoods*, 524 U.S. 924 (1998); *Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1101-05 (E.D. Mich. 1997) (holding that Michigan, the state with the greatest interest in the lawsuit, rather than the state of the parent corporation's incorporation, should govern). This case arose in Michigan and Michigan has the greatest interest in, and connection to, the events in question. New BSI is Michigan corporation, and the polluted property is in Michigan. The Court concludes that Michigan law governs the issue of piercing the corporate veil.

"Michigan law presumes that, absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities." *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995). "'The law treats a corporation as an entirely separate entity from its shareholders, even where one individual owns all the corporation's stock.'" *RDM Holdings, LTD v. Cont'l Plastics Co.*, 762 N.W.2d 529, 550 (Mich. Ct. App. 2008) (quoting *Rymal v. Baergen*, 262 Mich. App. 274, 293, 686 N.W.2d 241 (2004)). The presumption that

the parent and subsidiary corporations are separate and distinct entities "may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some other clearly overriding public policy.'" *Seasword*, 537 N.W.2d at 224 (quoting *Wells v. Firestone*, 421 Mich. 641, 650, 364 N.W.2d 670 (1984)).

"'The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations.'" *RDM Holdings*, 762 N.W.2d at 550 (quoting *Rymal*, 262 Mich. App. at 293). Under Michigan law, for the corporate veil to be pierced: (1) "'the corporate entity must be a mere instrumentality of another individual or entity;'" (2) "'the corporate entity must have been used to commit a wrong or fraud;'" and (3) "'there must have been an unjust injury or loss to the plaintiff.'" *Id.* (quoting *Rymal*, 262 Mich. App. at 293-94). *See also Cordova*, 113 F.3d at 580 ("Michigan appears to follow the general rule that requires demonstration of patent abuse of the corporate form in order to pierce the corporate veil. There must be such a unity of interest and ownership that the separate personalities of the corporation and its owner cease to exist, and the circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.").[3]

---

[3] Delaware law similarly requires a plaintiff to prove an abuse of the corporate form amounting to fraud or an injustice akin to fraud. *See Pauley Petroleum Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968) (holding that separate entities of parent and subsidiary corporations may disregarded "only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among
(continued...)

Plaintiff, as the party seeking to impose liability on the parent corporation, bears the burden of demonstrating grounds for piercing the corporate veil. *See Stryker Corp v. XL Ins. Am., Inc.*, No. 4:01-CV-157, 2006 WL 1997142, at *19 (W.D. Mich. July 14, 2006).

Plaintiff contends that the corporate veil between BorgWarner and New BSI must be pierced because (a) Kuhlman is merely a holding company for New BSI and has no known employees, business operations, or assets; (b) New BSI is undercapitalized; (c) New BSI did not observe corporate formalities; (d) New BSI was and is controlled and financed by its parent corporations; and (e) New BSI's existence is a fraud because its parent corporations were aware of its environmental liabilities and have made no arrangements to address such liabilities. (Dkt. No. 251, Pl.'s Br. 18-19.)

For purposes of the Bronson Defendants' motion for summary judgment, the Court construes the evidence and draws all reasonable inferences in favor of Plaintiff, the non-moving party. *See Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Nevertheless, even assuming the truth of Plaintiff's evidence, the evidence presented is not sufficient to create an issue of fact as to whether Kuhlman Delaware and BorgWarner have engaged in any kind of fraud or abuse of the corporate form such that they should be held derivatively liable for New BSI.

---

[3](...continued)
members of the corporation require it, are involved.") Accordingly, even if the Court were to apply Delaware law, the analysis would be essentially the same.

Plaintiff contends that in light of the three corporations' overlapping directors and the subsidiaries' lack of assets, employees, operations, and attention to corporate formalities, New BSI and Kuhlman Delaware are sham corporations operated to shield BorgWarner from liability.

"Organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud or reprehensible conduct justifying a disregard of the corporate form." *Cordova*, 113 F.3d at 580 (citing *Gledhill v. Fisher & Co.*, 262 N.W. 371, 373 (Mich. 1935)). "Virtually all corporations are formed for the purpose of limiting liability. Only where an attempt to limit liability is of a type that typically involves a specific attempt to thwart [legal] obligations is the application of relaxed alter ego principles justified." *NLRB v. Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 341 (6th Cir. 1990). There is nothing inherently suspect in a parent and subsidiary having overlapping officers and directors. *Bestfoods*, 524 U.S. at 69-70 ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.") Moreover, disregard of corporate formalities, in and of itself, is not sufficient to justify piercing the corporate veil. *Soloman v. Western Hills Dev. Co.*, 312 N.W.2d 428, 432 (Mich. Ct. App. 1981). Fraud, illegality, or injustice must also be shown. *Id.*

The evidence of record, viewed in the light most favorable to Plaintiff, reveals that BorgWarner and Kuhlman Delaware have simply maintained New BSI in the status in which

it has existed since 1990. Plaintiff has not identified any legal authority for holding BorgWarner and Kuhlman Delaware liable for New BSI's environmental liabilities merely because they continued the corporate existence of New BSI with outstanding potential liabilities. A parent corporation's mere control and ownership of a subsidiary corporation that lacks sufficient funds to meet its environmental obligations is not a sufficient basis for piercing the corporate veil. *See IBC Mfg. Co. v. Velsicol Chem. Corp.*, No. 97-5340, 1999 WL 486615, at *4 (6th Cir. July 1, 1999) (applying Tennessee law, and holding that in the absence of evidence that the parent corporation's control and ownership of the subsidiary was intended to defraud creditors, there was no basis for piercing the corporate veil even though the subsidiary could not pay its environmental liabilities). Plaintiff has not identified any legal basis for requiring a parent corporation to infuse money into a subsidiary corporation that cannot otherwise meet its financial obligations.

In a final effort to show fraud, Plaintiff asserts that the corporate veil should be pierced because it is undisputed that Kuhlman and KEC removed all assets from New BSI and kept it as an insolvent shell after 1990, with no funds to address known environmental liabilities. (Dkt. No. 278, Pl.'s Am. Reply Br. 1.) Evidence that a parent corporation drained a subsidiary of its assets so that the subsidiary could not meet its known environmental liabilities might well provide a basis for piercing the corporate veil. However, Plaintiff would have to show both knowledge of environmental liabilities and a removal of assets to avoid those liabilities. Plaintiff cannot meet either prong. The evidence simply does

not support Plaintiff's assertion that Defendants removed assets from New BSI at a time when they knew that New BSI had outstanding environmental obligations.

Plaintiff acknowledges that New BSI had no bank account as of 1990, after it had addressed the environmental contamination at the NBFF OU1 Site, and ceased operations. Plaintiff has presented no evidence of what assets New BSI had when it ceased operations. Plaintiff has not presented any evidence that Kuhlman Michigan, KEC, Kuhlman Delaware or BorgWarner removed any assets from New BSI, much less what assets they removed, when they removed the assets, or the purpose for which they removed the assets. Absent evidence on these issues, there is no basis for inferring that New BSI's lack of sufficient assets to meet its environmental obligations is attributable to its corporate parents. Nor is there any basis for inferring that New BSI's corporate parents removed assets from New BSI for the purpose of avoiding liabilities of their own or for some other wrongful purpose.

In addition, Plaintiff's fraud argument fails because Plaintiff has not shown that Defendants were aware that there were any cognizable claims for environmental liability. The directors and officers of the Bronson Defendants have testified that they had no knowledge from 1991 forward of any outstanding claims or unresolved liabilities related to New BSI. No one asserted a claim against the Bronson Defendants for environmental liabilities until ITT initiated this suit in 2005.

Plaintiff relies primarily on two pieces of correspondence to show that Defendants had knowledge of New BSI's environmental liabilities. The first is correspondence from the

EPA in 1986 addressed to New BSI and Kuhlman Michigan, asserting that both entities may be PRPs for environmental contamination at the NBIA site. (Dkt. No. 265, Ex. 4.) The letter specifically referenced the two waste disposal lagoons and connecting sewer systems. Through their attorneys New BSI and Kuhlman Michigan denied contributing to the claimed industrial contamination. (Dkt. No. 265, Ex. 5.) The EPA did not pursue New BSI, Kuhlman Michigan, or Kuhlman Delaware before entering into a consent decree regarding the NBIA site in March 1999. Neither did any of the parties to the consent decree pursue the Bronson Defendants prior to the initiation of this suit in 2005.

The second piece of correspondence relates to the NBFF OU1 Site. In 1988 New BSI received notice from the Michigan Department of Natural Resources ("MDNR") of potential contamination at the NBFF OU1 site. New BSI was no longer the operator at the site but it was still the owner of the site. In response to the MDNR's notice, from 1988 to 1990 New BSI undertook extensive excavation and removal actions, including the removal of seventy percent of the exposed soils down to the water table in most areas (10,000 tons of soil). (Dkt. No. 265 , Ex. 6, Site Status Report.) The correspondence Plaintiff relies on is a November 7, 1990, letter from Leonard Lipinski, a project manager for the MDNR, to counsel for New BSI and Kuhlman Michigan, advising what additional work was required to complete the investigation and remediation at the NBFF site and to bring the matter to closure. (Dkt. No. 251, Ex. 10, Lipinski Dep. 62, Dep. Ex. 11.) The letter concluded that additional work was needed to complete the investigation and to attain site closure, including a risk assessment

with respect to the contaminants that remained on site, additional soil sampling around the excavations, and additional monitoring wells. (Lipinski Dep. 62-64, 66.) New BSI did conduct some additional background soil samples, but it did not conduct all of the work described. (Lipinski Dep. 69; Dkt. No. 265, Ex. 9, 2/19/1991 letter to Lipinski.) There is no evidence that the MDNR sent any further correspondence to New BSI regarding the NBFF OU1 Site, or that it had any intention of pursuing, through any administrative process or suit, any claim against New BSI or Kuhlman Michigan, for conditions at NBFF OU1. In fact, in July 2001 when the EPA sent out the Special Notice of Liability letter regarding the separate NBFF operable units, it did not list New BSI as a PRP; the letter was only sent to ITT, L.A. Darling, and Scott Fetzer. (Dkt. No. 265, Ex. 11, 7/5/2001 Special Notice of Liability Ltr. from EPA re NBFF OU1.)

Neither of the letters Plaintiff relies on mandated any particular environmental response, nor did they contain any findings of liability on the part of New BSI. The fact that there were some discussions about potential environmental liability on the part of New BSI does not suggest that New BSI's denial of further liability was made in bad faith. The Court concludes that the evidence does not suggest that the Bronson Defendants were aware of any environmental liabilities. Moreover, even if there is a question of fact as to knowledge of environmental liabilities, the lack of evidence that New BSI's corporate parents removed any assets from New BSI in an effort to avoid those liabilities prevents this Court from finding the kind of wrongful conduct that would support piercing the corporate veil.

Plaintiff contends that other courts have pierced the veil in CERCLA cases where the parent corporation's acts were similar to those at issue in this case. These cases are distinguishable because they contained evidence that the corporate parent was involved in depleting assets from the subsidiary when it knew the assets would be required to address known environmental liabilities. *See Pharmacia Corp. v. Motor Carrier Servs. Corp.*, 309 F. App'x 666, 672 (3d Cir. 2009) (piercing the corporate veil where the nature of the subsidiary's business changed significantly after its purchase by the parent corporation and it ceased receiving revenue even though it had acknowledged responsibility for environmental contamination at the site); *AT&T Global Information Solutions Co. v. Union Tank Car Co.*, 29 F. Supp. 2d 857, 868 (S.D. Ohio 1998) (piercing the corporate veil where there was evidence that the parent corporation knew of the subsidiary's potential liabilities before liquidating the subsidiary's assets); *United States v. Kayser-Roth Corp.*, 724 F. Supp.15, 23-24 (D.R.I. 1989) (giving less respect than required by *Bestfoods* to the corporate form, and piercing the corporate veil where the parent corporation "exhibited overwhelming pervasive control" over the subsidiary, including control over its environmental matters).

The evidence in this case does not support piercing the corporate veil. Plaintiff has not presented any evidence to suggest that BorgWarner or Kuhlman Delaware ever used New BSI to shield themselves from any liabilities that they owed, or that they ever held New BSI out as something that it was not for the purpose of committing a wrongful or fraudulent act.

For the reasons stated herein, the Bronson Defendants' motion for partial summary judgment on claims against Bronson Specialties Inc. for liabilities incurred by the previous owner of the site and for summary judgment on all claims against BorgWarner Inc. and Kuhlman Corporation will be granted, and Plaintiff's motion for partial summary judgment will be denied.

An order and partial judgment consistent with this opinion will be entered.


Dated: July 22, 2009                              /s/ Robert Holmes Bell
                                                  ROBERT HOLMES BELL
                                                  UNITED STATES DISTRICT JUDGE