UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ITT INDUSTRIES, INC.,

       Plaintiff,

                                        File No.  1:05-CV-674
v.

                                        HON. ROBERT HOLMES BELL
BORGWARNER, INC., et al.,

       Defendants.

_____/

## **O P I N I O N**

     This is an action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., and Part 201 of the Michigan Natural Resources and Environmental Protection Act (NREPA), Mich. Comp. Laws §§ 324.20101-324.20142, for recovery of response costs at the EPA-regulated North Bronson Industrial Area Superfund site in Bronson, Michigan.

     This action was tried to the Court from August 26, 2009, through September 3, 2009. Having carefully considered the testimony, exhibits, deposition excepts, trial briefs, written closing arguments, and proposed findings of fact and conclusions of law, the Court enters this opinion incorporating its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

ITT filed this action for cost recovery and contribution in 2005. The parties and claims that remained for trial were the following:[1]

1. Plaintiff ITT Industries Inc.'s ("ITT")[2] claims for cost recovery under CERCLA § 107(a), 42 U.S.C. § 9607(a) and Part 201 of NREPA, Mich. Comp. Laws § 324.20126a, against Royal Oak Industries ("Royal Oak"), The Scott Fetzer Company ("Scott Fetzer") and L.A. Darling Company ("L.A. Darling"), for costs relating to response actions ITT performed at the former Bronson Reel facility, also known as Operable Unit 1 of the North Bronson Former Facilities Site ("NBFF OU1"). (Dkt. Nos. 88, 114.)

2. Royal Oak's counterclaim against ITT, cross-claim against Scott Fetzer and third- party claim against L.A. Darling for contribution under CERCLA § 113, 42 U.S.C. § 9613 and Part 201 of NREPA, should Royal Oak be found liable for more than its fair and equitable share of ITT's costs relating to NBFF OU1. (Dkt. No. 96.)

3. Scott Fetzer's counterclaim against ITT, cross-claim against Royal Oak, and third-party claim against L.A. Darling for contribution under CERCLA § 113, and Part 201 of NREPA, should Scott Fetzer be found liable for more than its fair and equitable share of ITT's costs relating to NBFF OU1. (Dkt. No. 112.)

---

[1]This case originally included additional parties and claims. However, prior to trial the Court dismissed Plaintiff's CERCLA § 107(a) claim for cost recovery involving the NBIA Site (Dkt. No. 224, 03/31/2009 Order), Plaintiff's claims against Defendants BorgWarner, Inc. and Kuhlman Corporation (Dkt. No. 283, 07/22/2009 Order), and Plaintiff's Part 201 cost recovery and contribution claims involving the NBIA Site (Dkt. No. 289, 07/28/2009 Order). In addition, the Court dismissed with prejudice Defendant Elmer Houghton Trust and its trustee, Century Bank and Trust, all claims and cross-claims against BSI, and BSI's counterclaims against ITT, cross-claims against Scott Fetzer and Royal Oak, and third-party claims against L.A. Darling, pursuant to the parties' stipulations. (Dkt. No. 111, 06/30/2009 Order; Dkt. No. 327, 08/25/2009 Order.)

[2]After filing this action, Plaintiff ITT Industries, Inc. became known as ITT Corporation. (Dkt. No. 88, Am. Compl.)

4. L.A. Darling's counterclaim against ITT for contribution under CERCLA § 113, and Part 201 of NREPA, should L.A. Darling be found liable for more than its fair and equitable share of ITT's costs relating to NBFF OU1. (Dkt. No. 151.)

## II.

Resolution of these claims requires an understanding of the historical efforts to address industrial wastes and environmental contamination in the City of Bronson, in Branch County, Michigan.

Beginning in the early 1900s, as manufacturing operations began to develop in the North Bronson Industrial Area ("NBIA"), companies discharged wastewater to County Drain 30 ("CD-30"). (FPT F-8.) In response to concerns about the water quality in CD-30, the City of Bronson built an industrial sewer system with lagoons. (FPT-F9.)[3] Between 1939 and 1949, the Bronson Reel Company ("Bronson Reel"), H.A. Douglas Manufacturing Company, ("H.A. Douglas") (the former Scott Fetzer facility) and L.A. Darling all discharged wastewater to these western lagoons via the western industrial sewer. (FPT F-10.)

By 1948, the western lagoons were reaching capacity, and the City of Bronson constructed new lagoons located in the northeast corner of the NBIA, which were commonly referred to as the eastern lagoons. (FPT F-11.) In 1949, the western industrial sewer overflowed in several areas along Railroad Street, causing storm sewer infiltration of

---

[3]Factual findings that are based on the uncontroverted facts agreed to by the parties in their revised final pretrial order (Dkt. No. 318) are designated as "FPT F-#."

wastewater. (Stephens Test.; Exs. 6052, 6053).  Beginning in 1949, wastewater from the former Scott Fetzer  and L.A. Darling  sites was re-directed to the new eastern lagoons via the eastern industrial sewer which ran north along Matteson Street.  The Bronson Reel facility continued to discharge wastewater to the western lagoons via the western industrial sewer.  (FPT F-12, F-68, F-58, F-59.)

In 1979, the Michigan Department of Natural Resources ("MDNR"  n/k/a Michigan Department of Environmental Quality "MDEQ") detected trichloroethylene[4] ("TCE") in groundwater samples from six monitoring wells in the vicinity of the western disposal lagoons in northwest Bronson.  (FPT F-1.)  TCE is commonly used as an industrial solvent for cleaning and degreasing and was likely in the waste streams of facilities which discharged to the eastern and western-lagoons.  (Ex. 5004, Warzyn RI, iii.)

In 1986, the U.S. Environmental Protection Agency ("EPA") included the NBIA on the National Priorities List for investigation and potential remediation of hazardous wastes under CERCLA.  (Ex. 5004, Warzyn RI 2-1).  The NBIA site covers approximately 220 acres, and is currently comprised of two operable units ("OUs"):

• NBIA OU1 includes the western and eastern industrial wastewater lagoons, sediments, and portions of CD-30, groundwater impacted by the lagoons discharging to CD-30, and exposure to groundwater throughout the NBIA site.

• NBIA OU2 includes the western and eastern industrial sewers and groundwater impacted by releases from the industrial sewers. (FPT F-2.)

_____

[4]The terms "trichloroethylene" and "trichloroethene" are both used in the record to describe the same substance.

The MDNR retained Warzyn Inc. to conduct a Remedial Investigation ("RI"_ of the NBIA. (Ex. 5004, Warzyn RI 1-1.) Warzyn conducted its field activities in 1988-1989, and filed its Remedial Investigation in 1993. The predominant contaminants found by Warzyn at the NBIA site were chlorinated ethene compounds, including TCE, and metals, including cadmium, chromium, copper, nickel, and zinc. (*Id.* at *ii-iii*.) The Warzyn RI found high concentrations of TCE in soil and groundwater at the L.A. Darling site and the Scott Fetzer site. (*Id*. at 5-38). TCE concentrations of 2,700 ug/L were found at MW21 on the L.A. Darling Site (*id.* at 5-21), and TCE concentrations of 30,000 ug/L were found at MW20 on the Scott Fetzer site (*id.* at 5-29). The Warzyn RI identified a regional groundwater plume of volatile organic compounds ("VOCs"), including TCE, and identified the L.A. Darling Sub-Area and the Scott Fetzer Sub-Area as potential sources of the TCE. (*Id*. at *ii-iii*.)

In 1996 and 1998 the MDEQ conducted field investigations regarding NBIA OU2, the industrial sewers. (Dkt. No. 6008, MDEQ NBIA OU2 Tech. Memo at 3.) Both VOCs and metals were found to be migrating in the groundwater. However, the contaminant of greatest concern to the EPA and the MDEQ was TCE. "Because of the relatively low mobility of metals in groundwater, the risk associated with metals is believed to be minimal when compared to the mobility and risk associated with the VOCs." (*Id*. at 9.) TCE, which was the most frequently reported VOC, was detected in fifty-eight of sixty-nine groundwater samples. (*Id*. at 5-6.) At L.A. Darling, TCE was detected in all seven groundwater samples, with the highest level at 28,000 ppb. (*Id*. at 10.) At Scott Fetzer TCE was detected in

numerous groundwater samples, with the highest level at 21,000 ppb. (*Id.* at 11.) TCE was also detected in groundwater samples from three locations north and down gradient of Bronson Reel, in close proximity to the industrial sewer line (GPW4, GPW5, and GPW6), with the highest concentration of 3,900 µg/kg detected at GPW4. (Ex. 6008 at 7; Ex. 1423, Map of Sample Locations Prior to SRI.) According to the MDEQ, the source of the TCE in the samples down gradient of Bronson Reel "may have been handling or disposal practices at the [Bronson Reel] facility, or releases from the industrial sewer." (Ex. 6008 at 11.) The MDEQ concluded that the industrial sewer, portions of the storm sewer, L.A. Darling, Scott Fetzer and Bronson Reel, appeared to be source areas of environmental contamination at the NBIA. (*Id.* at 10-11.)

In March of 1999, ITT, Scott Fetzer, L.A. Darling, Bronson Plating and the City of Bronson, all of which were associated with facilities that had historically discharged industrial waste water into the NBIA sewers and lagoons, entered into a Consent Decree with EPA regarding response activities and costs incurred with respect to the NBIA. (FPT F-3.) On September 27, 2000, the EPA issued a Special Notice Letter to ITT, Scott Fetzer and L.A. Darling with respect to the industrial sewers, NBIA OU2. (FPT-F38.) The primary goal of the NBIA OU2 Special Notice was to investigate regional groundwater impacted by VOCs (primarily TCE) originating from the industrial sewer. (Olmsted Test.) The EPA entered into negotiations with the three Special Notice recipients. Teresa Olmsted, Director of Environmental Programs at ITT, personally attended the meetings with the EPA regarding

the NBIA OU2 Special Notice. Olmsted explained that the parties' discussions with the EPA centered on the difficulty of determining what VOCs were originating from the industrial sewer rather than from the facilities because the L.A. Darling and Scott Fetzer former facilities had not yet been investigated. (Olmsted Test.) During these discussions it was suggested that addressing the facility sources could identify the most significant sources to the regional plume, could limit the investigation of the industrial sewer, or could make the sewer investigation moot if the facilities were the primary sources. (Olmsted Test.) By letter dated March 8, 2001, the EPA agreed that it was critical to develop a strategy for dealing not only with the industrial sewers but with the upstream sources as well. It accordingly allowed the three Special Notice recipients to choose between investigating the industrial sewer, or ending negotiations for the industrial sewer and entering into separate agreements for the investigation of each individual former facility. (Ex. 6124, EPA 03/08/2001 letter.) The three Special Notice recipients elected to terminate negotiations as to OU-2 and to proceed with the individual investigations of the former facilities. (*Id.*)

The separate but coordinated investigations became the North Bronson Former Facilities ("NBFF") site. The NBFF site lies within the 220-acre NBIA Superfund Site, but is not part of the NBIA from an administrative standpoint. The NBFF is comprised of three former manufacturing plants, each of which used metal plating operations at one time or another, as well as other metal working operations. There are currently three Operable Units ("OUs") within the NBFF:

• NBFF OU1 (also referred to as the "Bronson Reel site") is the Bronson Reel Former Facility located at 505 North Douglas Street.

• NBFF OU2 (also referred to as the "L.A. Darling site") is the L.A. Darling Former Facility located east of North Matteson Street at West Railroad Avenue.

• NBFF OU3 (also referred to as the "Scott Fetzer site") is the Scott Fetzer Company Former Facility located at 141 West Railroad Street, including Scott Fetzer's Plant No. 1, its Annex/Cyanide Destruction Facility ("Annex"), and portions of the western industrial sewer adjacent to the Site, along portions of State Street and North Walker Street. (FPT F-14.)

The EPA issued a Special Notice Letter to ITT with respect to NBFF OU1 on July 5, 2001. Similar Special Notice Letters with respect to NBFF OU2 and NBFF OU3 were issued to L.A. Darling and Scott Fetzer respectively that same day (collectively "NBFF Special Notice Letters"). (FPT F40.) The NBFF Special Notice Letters called for investigation rather than remediation.

On or about September 30, 2002, ITT entered into an Administrative Order by Consent ("ITT AOC") with the EPA regarding the Bronson Reel Former Facility. (FPT F-41.) The stated purpose of the ITT AOC was as follows:

In entering into this Consent Order, the objectives of U.S. EPA and the Respondent are: (a) to determine the nature and extent of TCE contamination in groundwater caused by the release or threatened release, if any, of TCE from OU1 (excluding the industrial sewer) by conducting a remedial investigation; (b) to determine and evaluate alternatives for remedial action (if any) to prevent, mitigate or otherwise respond to or remedy identified risks from OU1 related contamination other than that determined to be caused by the industrial sewer or other off-site sources; and (c) to provide for the recovery of response and oversight costs incurred by U.S. EPA with respect to this Consent Order.

(FPT F-42; Ex. 6013, ITT AOC at 3.)   Under the heading "Jurisdiction and General Provisions," the AOC provides that "the remaining work should focus on determining if a source for trichloroethene (TCE) in groundwater exists at OU1." (Ex. 6013, ITT AOC at 2.) "[T]his Consent Order requires the Respondent, as part of the RI/FS, to develop and evaluate potential remedial alternatives to address TCE contamination in groundwater originating from OU1 that presents an unacceptable risk to human health or the environment . . . ." (*Id.*)

Because the L. A. Darling and Scott Fetzer sites had already been identified as sources of TCE to the regional plume, the investigations required by their AOCs was not to determine whether they were a source of TCE, but to characterize the nature and extent of contamination caused by the release of all hazardous substances.  The purpose of the Scott Fetzer and L.A. Darling AOCs was described as follows:

> In entering into this Consent Order, the objectives of the U.S. EPA and the Respondent are: (a) to determine the nature and extent of contamination caused by the release or threatened release of hazardous substances, pollutants or contaminants at or from [OU2/OU3], by conducting a remedial investigation; (b) to determine and evaluate alternatives for remedial action (if any) to prevent, mitigate or otherwise respond to or remedy any release or threatened release of hazardous substances, pollutants, or contaminants at or from [OU2/OU3], by conducting a feasibility study; and (c) to provide for the recovery of response and oversight costs incurred by U.S. EPA with respect to this Consent Order.

(FPT-F47; Ex. 6010, NBFF OU3 AOC; Ex. 5012, NBFF OU2 AOC.)

ITT completed its Streamlined Remedial Investigation/Streamlined Remedial Assessment ("SRI/SRA") Report and submitted its Focused Feasibility Study ("FFS") in May of 2006.  (Ex. 6015, ITT NBFF OU1 SRI/SRA; Ex. 6066, ITT NBFF OU1 FFS.)  The

primary contaminants found during ITT's SRI were metals and total petroleum hydrocarbons ("TPH"). ITT recommended that no active remedial requirements be imposed for the Bronson Reel site because the site was not a source of VOCs to the regional groundwater plume and evaluation of other site-related contaminants showed no unacceptable risks requiring active remediation. (Ex. 6066, ITT NBFF OU1 FFS at 2-6, 2-10.) The remedy recommended by ITT was a restrictive covenant on the site that prohibited groundwater use because of TCE that migrated onto the site from upgradient sources. (*Id.* at 5-4; Olmsted Test.) ITT's FFS was approved by the EPA and the MDEQ in 2006.

Following a public meeting, the EPA issued a Record of Decision ("ROD") for the Bronson Reel site. (Ex. 6017, ITT NBFF OU1 ROD.) The ROD did not require any active remediation of TCE in the groundwater, regardless of the source. (*Id.*) The remedy chosen for the Bronson Reel site was the implementation of a restrictive covenant which in part requires an investigation of soil under the facility only if the foundations are removed and soil is exposed and restricts potable use of groundwater until it meets federal and state drinking water standards. (FPT F-44.) The ROD is not being implemented by ITT, but rather by (New) BSI in accordance with the terms of a settlement agreement dated August 25, 2009. (Ex. 1530, Settlement Agreement.)

### III.

ITT has filed a CERCLA § 107(a) cost recovery claim against Royal Oak, Scott Fetzer, and L.A. Darling. Liability under § 107(a) attaches where "a release, or a threatened

release . . . causes the incurrence of response costs." 42 U.S.C. § 9607(a)(4). ITTs prima

facie case for cost recovery requires ITT to prove the following elements:

> (1) the property is a "facility"; (2) there has been a "release" or "threatened
> release" of a hazardous substance; (3) the release has caused the plaintiff to
> incur "necessary costs of response" that are "consistent" with the NCP
> [National Contingency Plan]; and (4) the defendant is in one of four categories
> of potentially responsible parties.

*Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006) (citing

*Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc*., 240 F.3d

534, 541 (6th Cir. 2001)). The four categories of potentially responsible parties ("PRPs")

are: (1) the current owner or operator of a facility; (2) any person who, at the time of disposal

of a hazardous substance, owned or operated any facility at which such hazardous substances

were disposed of; (3) any person who arranged for disposal or treatment of hazardous

substances at the facility; and (4) any person who transported hazardous substances to a

waste facility. 42 U.S.C. § 9607(a)(1)-(4); *Centerior Serv. Co. v. Acme Scrap Iron & Metal

Corp*., 153 F.3d 344, 347 n.8 (6th Cir. 1998). Liability under § 107(a) is generally joint and

several on any defendant regardless of fault. *Kalamazoo River Study Group v. Menasha

Corp*., 228 F.3d 648, 653 (6th Cir. 2000) (citing *Centerior Serv.*, 153 F.3d at 347-48).

There is no dispute that the Bronson Reel site is a facility, that there has been a release

or threatened release of a hazardous substance at the Bronson Reel site, and that releases

have caused ITT to incur at least some necessary costs of response that are consistent with

the NCP. The issues for resolution at trial concerning ITT's cost recovery claim were

whether Defendants were PRPs, whether Defendants' releases of hazardous substances caused ITT to incur response costs, whether all of ITT's claimed costs were "necessary" and "consistent" with the NCP, and whether some of the costs were divisible. Resolution of ITT's cost recovery claim (as well as the various contribution claims) require an understanding of the historical operations and remedial activities at the three North Bronson Former Facility Operable Units ("NBFF OUs").

## A. BRONSON REEL SITE (NBFF OU1)

The Bronson Reel site, NBFF OU1, consists of approximately 1.85 acres located at 505 North Douglas Street in Bronson, Michigan. The site has been used for manufacturing operations from 1929 to 1994.

The Bronson Reel site was first occupied in 1929 by the Bronson Reel Company. In 1947, McAleer Manufacturing Company ("McAleer") purchased all of the stock of the Bronson Reel Company and the Bronson Reel Company became a division of McAleer. In 1950, McAleer changed its name to Higbie Manufacturing Company ("Higbie") which continued the operations at the Bronson Reel site. (FPT-F16 – FPT-F19.)

In April of 1963, Higbie sold its Bronson Reel division, including the site property, to Bronson Specialties, Inc. (hereinafter referred to as "(Old) BSI"), which operated the Bronson Reel Company as a subsidiary. In 1964, (Old) BSI changed the name Bronson Reel Company to Action Sales, Inc. In late 1967, (Old) BSI sold certain assets of the fishing reel

business to True Temper, Inc., but retained the Bronson Reel Company and much of the equipment. (FPT-F20.)

In 1968, (Old) BSI changed the name of the company that was previously Bronson Reel Company to Bronson Products Company, and continued to conduct metal working operations at the NBFF OU1 site. Bronson Products Company manufactured precision machine parts and custom machine tools and dies, as well as various metal parts for the automotive, and other industries. In January 1979, Kuhl, Inc., a wholly owned subsidiary of Kuhlman Corporation, created expressly to purchase (Old) BSI, acquired the assets and business of (Old) BSI, including Bronson Products Company, along with the former Bronson Reel site property. As part of the acquisition plan, (Old) BSI changed its name to BSI, Inc., and subsequently dissolved and distributed all assets of the corporation. Immediately thereafter, as part of the acquisition plan, Kuhl, Inc. changed its name to Bronson Specialties, Inc. (hereinafter referred to as "(New) BSI"), and continued the operations of (Old) BSI, including the operations of Bronson Products Company (custom and precision machining and production of metal parts), as a division of (New) BSI. (FPT-F21.)

After the 1979 acquisition, (New) BSI continued the operation of Bronson Products Company on the site though December 1984, and at that time sold the equipment and non-real property assets of its operations on the site to Bronson Precision Products ("BPP"), an assumed name of Defendant Royal Oak Industries, Inc. ("Royal Oak"). (New) BSI leased the Bronson Reel site to BPP and Royal Oak pursuant to a written lease agreement. BPP

13

continued the business of Bronson Products, including all metal working operations, as well as the addition of various new metal working equipment on the site, from 1985 until the end of 1994. At that time, BPP moved its operations to the building across the street, at 404 Union Street, but continued to use the Bronson Reel site through 2002 to store equipment and materials for its operations at 404 Union Street.  (FPT-F15; FPT-F22.)

In 1971, ITT, Higbie and ITT Higbie Manufacturing Company, a wholly owned subsidiary of ITT, agreed to a plan of merger whereby the shareholders of Higbie would receive shares of ITT in exchange for their shares of Higbie and Higbie would be merged into ITT Higbie. This merger was completed in 1972, nine years after Higbie had sold the Bronson Reel Company and the Site property to (Old) BSI.  ITT has never conducted operations on the Bronson Reel site and has never owned a subsidiary that conducted operations on the Bronson Reel site during ITT's ownership of the subsidiary.  ITT is a party to the NBIA OU1 consent decree, and the 2002 AOC regarding the NBFF OU1 Site.  (FPT-F23.)  ITT denies being a successor to the Bronson Reel Company, but counsel for ITT stipulated on the record that it is a proper party to this action, and that it agrees to answer for ITT Higbie Manufacturing Company.  (Stipulation 08/28/2009.)

## 1.  <u>Operations at the Bronson Reel site from 1929 to 1984</u>

In 1929, the original building at 505 North Douglas Street covered approximately 15,000 square feet. The primary operations of the former Bronson Reel site from 1929 through 1967 were related to the production of fishing reels, including machining, grinding,

stamping, trimming and plating of metal parts. Prior to 1948, the plating department was located on the eastern side of the original building, and the plating room's discharges to the industrial sewer had a connection on the east side of the facility on North Douglas Street. In approximately 1948, the facility building was expanded, which tripled the size of the manufacturing facility. After the 1948 building expansion, the plating department was moved to the western side of the building, with connections to the industrial sewer on the west side of the building via a north-south connector line. From 1963 through 1967, (Old) BSI continued metal working and plating operations, including discharges of plating wastes to the industrial sewer at the western lagoons. The production of fishing reels at this Site ceased in early 1968. (FPT F-24.)

From the late 1940s to the 1960s Bronson Reel purchased seven to eight 55-gallon drums of cutting oil per month. Much of the oil went out with the shavings. (Haynes Dep. 34, 35, 37.) Naphtha (oleum spirits) used at the plant for cleaning parts was tossed in with the shavings and thrown out into the backyard. (Haynes Dep. 33.) James Gerchow, who was the general manager of Bronson Products and BPP from 1971 to 1994, estimated based upon his conversations with the older employees about prior practices, that from 1922 to 1969, before the introduction of the centrifuge, for every 40,000 pounds of chips, approximately 8000 pounds of oil were released into the yard.

Beginning sometime during the 1960s, the operations at the Bronson Reel site also included a trichloroethylene ("TCE") degreaser. Use of the TCE degreaser terminated

sometime before 1971. (FPT F-25.) During the ten or so years that the TCE degreaser was in operation, it was located in the northwestern portion of the main building in the screw machine room north of the plating facility. (FPT F-26.) The TCE degreaser at the Bronson Reel site utilized approximately one 55 gallon drum of TCE every three months. (FPT F-27.) In contrast to the naphtha, TCE was not thrown out into the yard. The sludge from the TCE degreaser was shoveled into a paper barrel and taken to the dump. (Haynes Dep. 32.)

After the 1968 sale of the fishing reel business, (Old) BSI, under the name Bronson Products Company, continued metal finishing operations at the NBFF OU1 Site. Bronson Products Company primarily made small metal parts for the automotive industry, including speedometer gears for AC (Delco), and General Motors, specialty nut fastener products for Ford (e.g., lug nuts), cam shaft dampeners for Eaton Corporation, and other parts for Dana Corporation and Detroit Diesel. Bronson Products Company also made couplings and fittings for Aeroquip Corporation. Bronson Products Company produced metal parts for the U.S. Department of Defense, Teledyne Continental Motors, Swift & Company, and Ramer Test Tools. Bronson Products Company also made tooling (forms to cut steel) for screw machines. (FPT-F28.)

In April of 1969 the Michigan Water Resources Commission ("MWRC") stated in a letter to Bronson Reel that Bronson Reel's chip storage and soluble oil disposal methods created a "very hazardous and potential oil pollution problem" because open chip barrels were being stored at the rear of the plant on a concrete pad. The ground around the concrete

pad is saturated and "[t]he amount of oil draining from the chips and from the barrels is sufficient to migrate away from the property and onto Ruggles Street extended." (Ex. 6025, MWRC letter of 04/21/1969.) The MWRC also raised concerns about the untreated waste from the plating line entering the industrial sewer and the heavily laden rinse from the quenching process entering the storm sewer. (*Id.*) In 1973 the MWRC noted that operators at the site were spreading oil on the ground for dust control. (Venman Test.; Ex. 1285, 1973 MWRC Facilities Inspection Report.)

The operations at the Bronson Reel site did not change significantly when (New) BSI took over in 1979. (Gerchow Test.) The facility continued to produce metal parts using various screw machines, gear hobbing machines, broaching, thread-rolling, grinding, and roto-finishing (tumbling), and used some of the same equipment that had been used by Bronson Reel for the production of metal parts. The wastewater from the roto-finish department was discharged into a trench in the floor which connected to the industrial sewer or the storm sewer. (Venman Test.; Stephens Test.) The discharge contained metal particles, cutting oils, and solvents including naphtha and 1,1,1 TCA. (Gerchow Test.; VenmanTest.; Stephens Test).

(Old) BSI, the Houghton Defendants, (New) BSI and BPP all maintained metal chip bins in the yard to the west of the plant. Because the chip bins were not sealed, run-off from the bins was released onto the soils and included metal residues, cutting oils, metal chips, 1-1-1 TCA, and naphtha. (Gerchow Test.; Stephens Test.) Additionally, the various metals

used by the operations at the Bronson Reel site included brass, aluminum, and alloy steels, some of which contained chromium, lead and selenium. (Gerchow Test.; Ex. 6015, ITT NBFF OU1 SRI/SRA). The operators at the Bronson Reel site, including (Old) BSI, the Houghton Defendants, (New) BSI and BPP also stored fifty-five gallon drums of waste outside of the facility in an area near the maintenance shed in the western yard. (Gerchow Test.; Ex. 6015). There were three underground storage tanks ("USTs") at the Site used for fuel oil and other materials. (Stephens Test.; Ex. 1422, Map of Bronson Reel site.)

## 2. **Operations at the Bronson Reel site from 1984 to 1994**

Defendant Royal Oak Industries, through its subsidiary, Bronson Precision Products ("BPP"), operated at the former Bronson Reel site from December 1984 through 1994 pursuant to a lease with (New) BSI, and continued the same types of operations as its predecessors. (Gerchow Test.) Gerchow remained as general manager of BPP. (Gerchow Test.) BPP ran a cleaner operation than did its predecessors. BPP did not use TCE or perchloroethylene (PCE). It did not do any metal plating and it did not use heat treating equipment. (Gerchow Test.) The de-burring or roto finish process used detergent, water and abrasives, all of which were non-hazardous. (Gerchow Test.; Ex. 6027, MWRC Discharge Permit Application, at 10-11.) BPP used a centrifuge for spinning oil from chips and turnings from the screw machines. The centrifuge was a closed, recirculating system that was 90-99% efficient in removing oil. (Gerchow Test.)

ITT contends that based on Royal Oak's admissions in its answers to interrogatories, BPP released small amounts of oil and fine metal particles from the roto finish process into the industrial sewer. (Ex. 1004, Ans. to Interrog. No. 7.) Royal Oak subsequently amended this answer to indicate that the wastes from the roto finish process were released to the storm sewer or the sanitary sewer. (Ex. 1005, Ans. to Interrog. No. 7.) Mr. Gerchow had no specific recollection of where the roto finish wastes were released. He testified that the interrogatory answer was amended based upon the MDNR's May 11, 1988, letter regarding its site visit. (Ex. 1083, MDNR 05/11/1988 letter). The Court concludes that the MDNR's contemporaneous observation that the process waters emptied to a cement pit outside the building that went to the storm sewer is the best evidence of what occurred. The Court accordingly finds that Royal Oak released its roto finshi process waters to the storm sewer.

BPP used hazardous materials in its operations, including oils, solvents and metals. The facility used oleum spirits (naptha) to clean parts and some of the cutting oils used by BPP included 1,1,1 trichloroethane ("TCA") as an additive. The metals used in BPP's operations included 1,000,000 pounds of alloyed steel and 10,000 pounds of aluminum alloys and brass per year. (Gerchow Test.) These alloys contained hazardous metals including chromium, nickel, lead, manganese and molybdenum. (Ex. 1471, Table re: Composition of Metals; Ex. 1472, Table re: Composition of Metals.) The steel and aluminum alloy particles themselves are listed hazardous substances because the alloys contain elemental chromium, nickel, lead and other substances. (Stephens Test.)

No process at the facility used dissolved metals after 1981. (Stephens Test.) However, no additional physical or chemical process was required to cause a release of hazardous substances. Steel alloy chips and turnings were placed in bins (dumpsters) that were unconvered and open to precipitation. An oil-water mixture composed of 90% water and 10% oil seeped from the chip bins (Stephens Test.; Gerchow Test.) Metal chips or shavings were also released directly onto the soil during transport to the bins. The metal alloy chips or shavings are themselves hazardous substances because they contain listed hazardous substances in the form of chromium, nickel and lead and/or other hazardous substances. (Stephens Test.; Ex. 1471; Ex. 1472.) Accordingly, a release occurred when the metal shavings and particles were discharged to the soil. The metal chips were also subject to to later physical processes, including precipitation and snow melt over a period of years, causing low concentrations of metals to enter into solution to further contaminate soil and groundwater.

Notwithstanding BPP's use of a centrifuge, BPP still released oil to the ground. Metal chips still had oil on them, and the grinding swarf from the grinding operations did not go to the centrifuge. In May 1988, after inspecting the BPP facility, the MDNR sent BPP a letter noting its concerns about oil discharges to the ground and the discharge of untreated wastewater directly to the storm sewer:

> Quite a few barrels of waste oil stored outside. Some on a concrete pad with no containment and some on pallets in the yard. Evidence of oil runoff to the ground in several areas.

Open metal chip storage bin is located outside on the ground. No pad or oil containment. Pooled oil present on ground at one end of bin and evidence of long-time runoff of oils unto the soil (facility in operation since about 1920's).

(Ex. 1083, MDNR 05/11/1988 Letter re Site Visit.)

In June 1988, the Branch-Hillsdale - St. Joseph District Health Department ("District Health Department") conducted an on-site investigation the Bronson Reel Site. (FPT-F31, FPT F-33.) Based upon its observations of waste storage and labeling violations and illegal discharges, the District Health Department issued a report concerning BPP's waste storage and handling practices and required BPP to take corrective actions. (*Id.*; Ex. 6036, 06/22/1988 District Health Dep't letter; Laurent Dep., 13, 17-20).

Subsequent to the inspection by the District Health Department, (New) BSI conducted an investigation and excavation of contaminated soils as well as the removal of an underground oil storage tank, an oil-water separator and a portion of the industrial sewer along the northern edge of the Bronson Reel Site. (FPT F-34.) ITT and Royal Oak shared in the costs, along with (New) BSI, of remediating and investigating metals and petroleum contamination at the former Bronson Reel Site in the 1988-1990 response activities together with other site owners and operators. (Olmsted Test.; Gerchow Test.)

Prior to excavation, four soil borings were selected for VOC analysis, and TCE was not detected in any of the samples. (Ex. 6015, SRI/SRA at ES-1.) The soil excavation took place throughout the fall of 1988 and winter of 1989. Most of the soil from the main yard area was removed to a depth of 8-10 feet. (*Id.* at 1-7. More than 10,440 tons of soil was

removed by the excavation contractor A.P.E.C., Ltd. (FPT F-36.) The soils that were excavated were generally not tested for VOCs, but were found to be impacted with metals and petroleum hydrocarbons. (Ex. 6015 at 1-7.)

David Schafer, President of A.P.E.C., Ltd., found drums containing metal shavings and oil stored outside along the west fenced area. (Schafer Dep. 28, 54.) There was evidence that the drums had leaked because the soil was stained and discolored in the drum storage area. (*Id.* at 137-38, 140.) There were metal shavings throughout the yard area and within the soil on the west side of the BPP building. (*Id.* at 38-39.) Schafer confirmed that BPP used large metal dumpsters for storage or metal chips, shavings and turnings, and that the metal bins released a mixture of waste oils directly to the soil at the site during BPP's operations. (*Id.* at 23, 24, 28, 29, 31-33, 142.)

During the remediation, the contractor ruptured a sewer pipe. (FPT F-35.) More than 500 gallons of wastewater were released, but the materials released from the sewer were never characterized. (Venman Test.)

Following the 1988-90 excavation, soils in the sidewalls were still observed to be oily. In addition, oil was observed in the bottom of the excavation at the water table, indicating that contamination had migrated to groundwater. (Stephens Test.) A sump was installed to collect contaminated groundwater, but no remediation of groundwater was conducted as part of the 1988-90 removal action. (Stephens Test.; Venman Test.) Following the excavation, forty-one soil samples were collected from the excavation sidewalls and from borings outside

of the excavation. Of the forty-one samples, TCE was detected in only two samples, in concentrations of 60 µg/kg and 110 µg/kg. Because the acceptable soil criteria for TCE is 100 µg/kg, the TCE concentrations at the Bronson Reel site were relatively low. (FPT F-37; Stephens Test.; Ex. 6015, ITT SRI at ES-1.) The sidewall samples containing TCE were located in the northeastern portion of the western yard at the Site, near the area of the building where the former TCE degreaser was reported to have been located. (Ex. 1478; FPT F-26.) Although the yard was excavated primarily to remove soils impacted with metals and petroleum, that excavation would also have removed TCE contamination. The excavated soils were not fully characterized for volatile organic compounds such as TCE.

In November of 1990, the MDNR outlined some additional work that it wanted BPP to conduct in order to complete the investigation and remediation of the Bronson Reel site, including:

a.      sampling around the perimeter of the former excavations including testing for metals, hydrocarbons and volatile organic compounds;

b.      installation of wells to determine if the contaminated soil is negatively impacting the groundwater, including testing for metals, hydrocarbons and volatile organic compounds;

c.      installation of additional down-gradient wells to determine the extent of the TCE found in the wells; and

d.      further work to address metals contamination identified during the drilling of monitoring well four.

(Ex. 6003, MDNR Letter of 11/07/1990.) It appears that the MDNR's concerns were triggered by its detection of TCE in monitoring wells northwest of the Bronson Reel site

during its NBIA investigation in 1998, rather than by anything found during the remediation at the Bronson Reel site. The MDNR directed BPP to submit a work plan before undertaking any further work. There is no indication that any further work was conducted in response to this letter. (Wells Test.; Sklash Test.) Nor is there any indication that the MDNR followed up with BPP concerning this letter or the status of the remediation of the Bronson Reel site.

## B. SCOTT FETZER SITE (NBFF OU3)

The Scott Fetzer site, NBFF OU3, consists of the former manufacturing facility, historically referred to as Plant No. 1, located west of North Matteson Street, and north of State Street, and the annex located south of State Street. The Scott Fetzer site was operated by the H.A. Douglas, which later became Kingston Products-Douglas Division, from 1910 through 1968. The Scott Fetzer Company purchased the Kingston Products-Douglas Division in 1968, and continued operations at the site until January of 1984. Scott Fetzer has not owned or operated the site since selling it to an unrelated entity in 1984. (FPT F-64; FPT F-65; FPT F-73.)

When H.A. Douglas began operations at the Scott Fetzer site in 1910, it designed and manufactured electrical parts for automobiles. By the late 1940s, Kingston Products-Douglas Division manufactured automobile electrical products, military products including tank track links and electrical switches, and consumer products including appliance timers and vacuum cleaners. Over time, Scott Fetzer conducted operations to plate various metals with cadmium, chromium, silver, tin, and zinc. (FPT F-66.)

In or around 1951, H.A. Douglas constructed a cyanide destruction facility on the annex property south of its main plant and State Street. At this point, H.A. Douglas began discharging waste waters to the City of Bronson storm sewer. (FPT F-69.) Scott Fetzer utilized a TCE degreaser at its facility on Railroad Street. The date on which TCE use at the facility began is not known, but TCE use continued until 1980. Scott Fetzer also had a 2,150 gallon TCE storage tank, and a solvent recovery still in the south central portion of the facility. (FPT F-67.)

H.A. Douglas discharged untreated plating wastes and other waste waters to the western industrial sewer and the western lagoons from 1939 to 1949. (FPT F-68.) In or around 1949, H.A. Douglas ceased discharging to the western industrial sewer and began discharging to the eastern industrial sewer and the eastern lagoons. (FPT F-68.) Both the eastern and western industrial sewers exit the Scott Fetzer facility along State Street, south of the plating area, and travel west on State Street and north on Walker. The western sewer travels west on Railroad Street, while the eastern sewer travels to the east on the south side of Railroad Street. (Stephens Test.; Ex. 1427, Map of Scott Fetzer Site.)

The EPA has identified the former Scott Fetzer site as a source of metals and VOCs in groundwater within the NBIA Superfund Site. In 2002, the EPA entered into an Administrative Order on Consent with Scott Fetzer for NBFF OU3. (Ex. 6010, NBFF OU3 AOC.) The AOC required Scott Fetzer to conduct a remedial investigation and feasibility study to investigate the historical use of various hazardous substances including, but not

limited to, TCE. (FPT F-70.) Scott Fetzer was also required to address off-site vapor intrusion contamination pursuant to a Unilateral Administrative Order issued by the EPA in 2008. (FPT-F71.) The EPA has approved the RI and FS reports submitted by Scott Fetzer pursuant to the AOC for NBFF OU3, has issued a proposed plan for additional response action at NBFF OU3, and intends to issue a ROD for NBFF OU3 by September 30, 2009. (FPT-F72.)

It is undisputed that the Scott Fetzer facility is highly contaminated with TCE. Concentrations of TCE as high as 15,000 µg/kg were detected in soil at the facility near the TCE degreaser and solvent pits at Plant # 1. (Ex. 1427, Map of Scott Fetzer Site; Ex. 1450, Map of TCE in Soil at Scott Fetzer.) The outside tank that held TCE was "relatively unprotected" and situated near "aging concrete." (Strobel Dep. 55.) A second significant source area for TCE is the Cyanide Destruction Facility/Annex located south of State Street. Concentrations of TCE as high as 68,000 µg/kg were detected in this vicinity. (Ex. 1450.) A waste drum storage area in this portion of the facility appears to be a significant source of TCE to soil and groundwater. (Stephens Test.; Ex. 1438, Map of TCE at Water Table; Ex.1450.) The drums of waste stored outside the waste treatment facility (annex), south of State Street were stored directly on the ground and were moved from time to time. (Strobel Dep. 106-07; Somerlott Dep. 22). "Hotspots" of TCE in the soil overlie high concentrations of TCE in the groundwater at Scott Fetzer, demonstrating that there are significant local sources on the site. (Stephens Test.) The same general areas of high concentrations of TCE

releases are depicted in the soil gas. (Stephens Test.; Ex. 1447, Map of TCE in Shallow Soil Gas.)

The data compiled by Scott Fetzer's consultant, Haley & Aldrich, and included in Scott Fetzer's NBFF OU3 remedial investigation, confirm that the soil and groundwater was heavily contaminated. (Exs. 1489-94, Maps of TCE in Soil Gas, Soil, and Groundwater.) The Haley & Aldrich maps depict the same release areas for TCE near the degreaser and drum storage areas on the Scott Fetzer site, and demonstrate how TCE has migrated west from the Scott Fetzer facility to impact the Bronson Reel site. (Stephens Test.)

In addition to its TCE releases directly to the soil, Scott Fetzer also discharged TCE to the industrial sewers and the storm sewers. These releases also impacted groundwater beneath the former Bronson Reel site through the regional plume and direct releases onto the property. Scott Fetzer had numerous communications with the state during the 1960s and 1970s addressing problems with the effluents being released to the storm sewers. (*See*, *e.g.*, Exs. 1368-75, 1377-85, Communications Between Scott Fetzer and MWRC, MDNR.) The state notified Scott Fetzer in August of 1979 that TCE was found in two outfalls to the storm sewer from the Scott Fetzer facility. (Ex. 1110; MDNR Letter of 08/02/1979.) Both TCE and metals were discharged from Scott Fetzer to the storm sewer. (*See*, *e.g.*, Ex. 1383, Results of 09/17/1979 Wastewater Monitoring.) In September of 1980, the MDNR required a meeting with Scott Fetzer regarding ongoing TCE discharges in the effluent. (Ex. 1113; MDNR letter of 09/02/1980.) Norbert Strobel, who worked at Scott Fetzer from 1973

forward, and who was responsible for responding to the state regarding environmental issues, admitted that the TCE discharges from Scott Fetzer remained a "continuing issue" in 1980. (Strobel Dep. 93, 105.)

High concentrations of TCE are found along the industrial sewer on North Walker Street, especially at the sewer manhole at the intersection of North Walker and Railroad Streets near the northwest corner of the Scott Fetzer facility. (Stephens Test.; Exs. 1438, 1447, 1450, 1489, 1490, Maps of TCE in Groundwater, Soil, and Soil Gas.) Scott Fetzer was the only discharger to this portion of the industrial sewer. (Stephens Test.; Ex. 6050, 1940 Sewer Tracings). Scott Fetzer's expert, Dr. James Wells, admitted that Scott Fetzer's releases of TCE to the industrial sewer were a source of contamination to soil and groundwater. The data indicate a source of TCE from Scott Fetzer's discharges to the western industrial sewer. (Wells Test.)  Discharges from Scott Fetzer to the storm sewer on State Street also likely conveyed TCE and metals to the south side, as well as the west side of the former Bronson Reel facility, along North Ruggles Street. (Stephens Test.)

The Scott Fetzer site is located approximately 500 feet east of the Bronson Reel site. There is a clear migratory path ("fingerprint" or "diagnostic tracer") of VOCs from the Cyanide Destruction Facility to the Bronson Real site, and releases from the Scott Fetzer plant flow directly toward the Bronson Reel site.  (Stephens Test.; Sklash Test.; Ex. 1453.) In the opinion of Dr. Daniel Stephens, ITT's expert witness, TCE released from Scott Fetzer impacted the groundwater beneath the former Bronson Reel facility. (Stephens Test.)  Scott

Fetzer and its expert, Dr. Wells, do not dispute this conclusion. The evidence also supports a finding that Scott Fetzer released metals into the soils, groundwater and sewers at the former Scott Fetzer facility, and that those hazardous substances have also migrated to the Bronson Reel site.

## C. L.A. DARLING SITE (NBFF OU2)

The L.A. Darling site, NBFF OU2, consists of approximately 2.5 acres located along the east side of North Matteson Street, and is bisected by Railroad Street. (FPT F-45.) The L.A. Darling site is located approximately 1,200 feet from the Bronson Reel site and is located generally to the east along Railroad Street. (FPT F-56.) L.A. Darling, or its predecessors, operated at the facility from 1909 until 1967, manufacturing store display fixtures and retail shelving. (Ex. 1142, NBFF OU2 ROD at 5). L.A. Darling's operations included chromium and cadmium plating and degreasing of metal parts with a vapor degreaser using TCE. (Ex. 6016, NBFF OU2 RI at vii.) Initial plating operations were conducted on the western half of Lot 46. Materials, including fuels and spent chemicals, were staged on the eastern half of Lot 45. During the 1930s, the plating operations were moved to the eastern half of Lot 46. In 1950, L.A. Darling expanded its operations south of Railroad Street. (FPT-F60.) After 1950, the plating and degreasing operations were located in this portion of the facility south of Railroad Street. These operations included TCE degreasing. L.A. Darling ceased operations at its Bronson plant and ceased discharging any wastewater to the eastern lagoons in 1967 upon closing its operations in Bronson, Michigan and relocating to Paragould, Arkansas. (FPT-F13; FPT-F55.) After 1967, various operations

were conducted at the L.A. Darling Former Facility which were unrelated to L.A. Darling, and the LA. Darling site was eventually acquired by the City of Bronson. (FPT-F63.)

From 1939 to 1949, L.A. Darling discharged process wastewater/untreated wastes to the western lagoons via the portion of the City industrial sewer that ran west along Railroad Street. (FPT F-57; FPT F-58.) After 1949, when the western lagoons could no longer handle the volume of discharges, L.A. Darling began discharging to the newly constructed eastern industrial sewer and the eastern lagoons. (FPT F-57; FPT-F60.)

On or about June 5, 2002, L.A. Darling entered into an Administrative Order on Consent with the EPA ("NBFF OU2 AOC") to address the potential sources of contamination at the L.A. Darling site, and determine the nature and extent of contamination caused by releases on the L. A. Darling site. (FPT-F46.) As part of its investigation, L.A. Darling conducted sampling of both soil and groundwater at the L.A. Darling site. (FPT F-48.) L.A. Darling's investigation was memorialized in the Final RI/FS Report, dated February 2006, and was approved by the EPA. (FPT-F49.)

In September of 2008, the EPA issued the Record of Decision ("ROD") for the L.A. Darling Former Facility, and selected the remedial action for soils and groundwater. The ROD requires active remediation to address levels of TCE and other VOCs in soil and groundwater at the L.A. Darling site. (FPT-F53; Ex. 6020, NBFF OU2 ROD.) In addition, L.A. Darling addressed off-site vapor intrusion sampling, pursuant to a Unilateral Administrative Order, Docket No. V-W-08-C-901 issued by the EPA on May 28, 2008, the focus of which was residences located to the north of the L.A. Darling site. (FPT-F54.)

TCE source areas at the former L.A. Darling site include: (1) in the vicinity of the former TCE degreaser and chemical stripper tank on the south side of Railroad Street; (2) in the vicinity of the former chemical storage area, or other operational areas in the building north of Railroad Street, and north of the pre-1950 plating area; and (3) in the industrial sewer and storm sewer. (Ex. 6016, NBFF OU2 RI at 26-28; Ex. 6020, NBFF OU2 ROD at 9-12.)  High levels of TCE were also detected in sludge material released on the property south of Railroad Street. (Avendt Test.)

TCE has been detected in very high concentrations in soil throughout the entire L.A. Darling facility and is not limited to a few discrete source areas.  (Ex. 6016; Ex. 1437, Map of TCE in Soil, 0-10 ft.)  Concentrations of TCE as high as 280,000 µg/kg in soil were detected at the L.A. Darling facility in the northern building that housed plating operations prior to 1950.  (Ex. 1437.)  A second source area in the building south of Railroad Street has TCE concentrations as high as 180,000 µg/kg.  (*Id.*)  Soils throughout the Railroad Street corridor that included the connections to the industrial sewers (both the eastern industrial sewer and the historic western industrial sewer connection) were heavily contaminated with TCE at concentrations as high as 13,000 µg/kg, indicating releases and discharges to the sewers in this area. (Ex. 1524, Map of TCE in Soil from Railroad St. Excavation.)

TCE was also detected in high concentrations in groundwater throughout the L.A. Darling site. (Ex. 6016, NBFF OU2 RI § 4.2.3; Ex. 1438, Map of TCE at Water Table; Ex. 1440, Map of TCE in Intermediate Portion of Upper Aquifer; Ex. 1441, Map of TCE in Deep Portion of Upper Aquifer.)  Concentrations of TCE in groundwater beneath the site have

been detected at concentrations as high as 5,600 µg/kg in the monitoring wells and at concentrations of 38,000 µg/kg and higher in the geoprobes. (Stephens Test.; Exs. 1438-1441.) TCE concentrations on the L.A. Darling site are the highest of all the former facilities and are significantly more widespread.[5]

The exhibits compiled by Dr. Stephens, utilizing data from all three former facilities' RI Reports, confirm that the L.A. Darling site is a source of TCE to the regional groundwater plume. (Stephens Test.)

## IV.

In order to establish its CERCLA § 107(a) cost recovery claim, ITT is required to prove that the Defendants' releases of hazardous substances caused ITT to incur response costs. *Reg'l Airport Auth.*, 460 F.3d at 703.

### A. ROYAL OAK

Royal Oak contends that it is not liable because ITT found no contamination relating to BPP's releases, and BPP's releases did not cause ITT to incur response costs. Specifically, Royal Oak contends that it is not liable because ITT did not spend any money sampling for TCA, PCE, naphtha, metals or petroleum contamination in the soil in the areas of BPP's chip bins.

Royal Oak's argument is not persuasive. Although BPP was not responsible for the

_____

[5]The highest TCE detections in soil at L.A. Darling were four times higher than at Scott Fetzer, and more than 2,000 times higher than at the Bronson Reel site (compare 110 µg/kg in soil at Bronson Reel to 280,000 µg/kg in soil at L.A. Darling).

majority of the releases of hazardous substances at the Bronson Reel site, BPP acknowledges that it was responsible for releases of TCA, PCE, naphtha, metals and petroleum. Contrary to Royal Oak's argument, BPP's releases were not confined to the area surrounding the chip bins. During its tenure at the Bronson Reel site, BPP released waste oils and metal alloy particles into the soils from both the metal chip storage bins and leaking drums in the outdoor waste drum storage area.

"CERCLA establishes strict liability for 'any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.'" *U.S. Bank Nat. Ass'n v. EPA*, 563 F.3d 199, 207 (6th Cir. 2009) (quoting 42 U.S.C. § 9607(a)(2)). Accordingly, ITT is not required to show that it spent money responding to contamination specifically linked to BPP. Moreover, Royal Oak's expert witness, Bradley Venman, acknowledged that BPP's discharges of waste oils and metal alloy particles could not be differentiated from releases by any previous operator at the Bronson Reel site. He also acknowledged that sidewall sample data from the 1988-90 remediation confirmed that hazardous substances in the form of nickel, lead, and other metals, as well as TPH, were detected in the unexcavated soils near BPP's leaking metal chip bins, and that this remaining contamination was evaluated during ITT's NBFF OU1 risk assessment.

The Court is satisfied that ITT has shown by a preponderance of the evidence that the Bronson Reel site is a facility, that BPP released hazardous substances in the form of waste oils with entrained metal alloys containing hazardous substances while it was an operator at

the Bronson Reel site, that those releases caused ITT to incur response costs, and that Royal Oak is liable to ITT for cost recovery.

## B. L.A. DARLING AND SCOTT FETZER

This Court previously determined that with respect to the off-site Defendants, L.A. Darling and Scott Fetzer, the causation element is governed by the "two-site" standard. (Dkt. No. 293, 07/29/2009 Op. at 4.) In a "two-site" case, where hazardous substances are released at one site and allegedly travel to a second site, the plaintiff must establish "a causal connection" between the defendant's release of hazardous substances and the plaintiff's response costs. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999). A mere possibility of a such causal connection is not sufficient. *Id.* at 1072.

The off-site Defendants have raised two distinct arguments relating to the requirement that there be a causal connection between the release and ITT's response costs.

## 1. <u>Impact on Bronson Reel</u>

According to L.A. Darling, in order to meet the causation requirement in a two-site case, ITT must show that contamination from a second site's facility has "impacted and been 'finger-printed' at Plaintiff's property." (Dkt. No. 341, L.A. Darling's Proposed Conclusions of Law ¶ 10.) L.A. Darling contends that it cannot be held liable under § 107(a) because ITT failed to establish that any contamination from the L.A. Darling site has impacted the Bronson Reel site.[6]

---

[6]Scott Fetzer does not dispute ITT's claim that TCE released from the Scott Fetzer site has impacted the Bronson Reel site.

Although the Court agrees that ITT must show that it has been impacted by L.A. Darling's contamination, the Court declines to adopt a rule requiring ITT to show that L.A. Darling's contamination has been "finger-printed" at the Bronson Reel site. In *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1382 (W.D. Mo. 1994), the court expressed its concern that applying a strict liability presumption in a "two-site" case without modification would hold liable anyone who released the same type of substance that had contaminated another site. *Id.* at 1387. "A party who discovers TCE groundwater contamination in Missouri could successfully sue every party who released TCE in the entire country." *Id.* To avoid this "absurd result," *Thomas* did not require fingerprinting in every two-site case. As noted in *Thomas*, "'[f]ingerprinting' to prove actual contamination caused by the defendant is not necessary where the plaintiff can show that the release or threatened release by the defendant, and not the actual contamination, caused the plaintiff to incur response costs." *Id.* at 1390. *Thomas* merely required fingerprinting in those cases where the response costs were incurred solely as a result of and in response to actual contamination. *Id.*; *see also Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 186 (D. Conn. 2009) (noting that other courts merely require a plaintiff in a two-site case to provide "some evidence linking its response costs to the targeted off-site release of contaminants").

ITT asserted two pathways by which contaminants from the L.A. Darling site have impacted the Bronson Reel site: groundwater migration and the industrial sewer.

a. Migration

TCE in groundwater originating from the L.A. Darling site has migrated off-site, has combined with TCE released to groundwater from the Scott Fetzer facility, and has formed a regional groundwater plume. All of the experts in this case, including L.A. Darling's expert, Dr. Michael Sklash, agree that the L.A. Darling facility is a source of TCE to the regional groundwater plume, and that L.A. Darling's off-site groundwater plume has commingled with Scott Fetzer's groundwater plume in certain areas. (Sklash Test.; Stephens Test.; Wells Test.) Dr. Sklash also agrees that a portion of the regional plume and TCE released from the western industrial sewer have impacted the Bronson Reel site. (Sklash Test.) Dr. Sklash testified, however, that none of the TCE impacting the Bronson Reel site originated on the L.A. Darling facility. (Sklash Test.) It is Dr. Sklash's opinion that any TCE that originated at L.A. Darling could not have reached Bronson Reel within the applicable time frame. This position is opposed by all the other experts who addressed the issue, and is not supported by the weight of the evidence. (Wells Test.; Stephens Test.)

The migration analysis begins with several facts and principles that are not in dispute. The Bronson Reel site is approximately 1200 feet west to southwest of the L.A. Darling site. The groundwater flow direction in the NBIA area is predominantly west to northwest. (Exs. 6007, 6008, MDEQ NBIA Tech. Mems. I & II; Sklash Test.; Stephens Test.; Exs. 1442-46, Maps of Groundwater Flow Paths; Wells Test.; Wells Exs. 26, 27, Maps of Groundwater Flow Direction.) During the rest of the time, groundwater in the area flows in a southwesterly direction. (*Id.*) TCE in the groundwater moves downward as it migrates away

from the source area, and concentrations are generally highest near the source. (Sklash Test.; Stephens Test.)

Dr. Sklash evaluated the groundwater transport of TCE from the former L.A. Darling property toward the former Bronson Reel property in two ways. First, he examined the distribution of TCE in soil and groundwater along a vertical cross-section of the soil and groundwater between the two properties. (Ex. 5035, Vertical Cross-section Map.) Second, he examined the transport rate of TCE in groundwater between the two properties to determine whether TCE could move from the former L.A. Darling property to the former Bronson Reel property within the relevant time frame. (Sklash Test.)

Dr. Sklash testified that his vertical cross-section model reveals three important characteristics of the TCE distribution in groundwater that are not easily observed in an overhead view: (1) the concentrations of TCE in groundwater originating from the former L.A. Darling property dissipate quickly in the west/southwest direction, (2) the TCE contamination originating from the former L.A. Darling property moves vertically downward, and (3) the TCE contamination originating from the former L.A. Darling property is separate and distinct from the TCE contamination originating from the former Scott Fetzer property. (Sklash Test.; Ex. 5035.) For example, he showed that TCE concentrations in groundwater at GPW-2 and GPW-3 were in excess of 10,000 µg/L at the L.A. Darling Former Facility, but decreased to less than 100 µg/L within 200 feet to the west of the cross-section. (*Id.*) The contours on Dr. Sklash's vertical cross-section model show a disconnect between the TCE from L.A. Darling and the TCE from Scott Fetzer.

Dr. Stephens, on the other hand, testified that TCE contaminated groundwater migrated over 1,200 feet in an unbroken pathway from the L.A. Darling site to the Bronson Reel site. According to Dr. Stephens, Dr. Sklash did not follow standard scientific practices when he contoured the data. Dr. Sklash assumed a TCE concentration of less than 100 μ/L merely because of an absence of data. When Dr. Stephens altered Dr. Sklash's contours according to standard scientific practices, the contours reflected contamination that continued through the entire zone. Dr. Stephens testified that although there are certain "hot spots" of contamination on the L.A. Darling and Scott Fetzer properties, the hot spots are explained by specific sources of contamination. As the contamination moves down gradient, the plumes from L.A. Darling and Scott Fetzer co-mingle. (Stephens Test.) As indicated in Dr. Stephens's groundwater data maps depicting the groundwater plume at various depths within the aquifer, by the time the regional groundwater plume reaches the former Bronson Reel facility, it is a single, continuous plume of contamination. (Stephens Test.; Exs. 1438-41, Maps of TCE in Groundwater.) In particular, Dr. Stephens's Exhibit 1441 shows a continuous unbroken pathway of contaminated groundwater in the deeper portions of the upper aquifer that span the area between L.A. Darling and the former Bronson Reel facility. (Stephens Test.; Ex. 1441.) There is insufficient evidence to differentiate any TCE contamination originating from the former L.A. Darling facility from any TCE contamination originating from the former Scott Fetzer facility, or to determine the relative contributions of TCE in groundwater from each facility. (Stephens Test.; Wells Test.)

The Court finds Dr. Stephens' opinion regarding the continuous nature of the contamination in the groundwater to be more persuasive than Dr. Sklash's opinion regarding a disconnect between the contamination from L.A. Darling and the contamination from Scott Fetzer. The Court finds that TCE contamination in groundwater originating at the L.A. Darling site has commingled with TCE contamination in groundwater originating from the Scott Fetzer site.

Dr. Sklash's opinion that the TCE from L.A. Darling did not impact the Bronson Reel site was also based on his calculation of the transport rate of TCE in groundwater. Dr. Sklash testified that, based on his calculations, the TCE released from the L.A. Darling site would not have had sufficient time to migrate to the Bronson Reel site.

Dr. Sklash's calculations suffer from several flaws. First, Dr. Sklash assumed that the first release of TCE at the L.A. Darling site occurred in 1950, which is the approximate date that the TCE degreaser was constructed on the southern portion of the L.A. Darling property.

As discussed below, the Court finds, by a preponderance of the evidence, that L.A. Darling used TCE prior to 1950. Nevertheless, even assuming the first use of TCE by L.A. Darling was in 1950, the evidence indicates that there was sufficient time for TCE to migrate from the L.A. Darling site to the Bronson Reel site. Dr. Sklash assumed a groundwater flow rate of 40 feet per year, which he admitted was at the low end of the velocities reported in prior investigations he reviewed. Dr. Stephens performed an independent review of available data for the North Bronson area and calculated a range of groundwater flow velocities of 58 to 269 feet per year with an average velocity of 138 feet per year. Dr. Stephens also testified

that pumping tests are the preferred method of assessing groundwater flow velocity, and that a pumping test conducted by Douglas Autotech in the North Bronson area calculated a groundwater flow velocity of 300 feet per year. Although a 1993 report prepared by Warzyn Inc. (Ex. 6004) reported a groundwater flow velocity of 34 feet per year, Dr. Stephens explained that the flow velocity was based on measurements from an area north of the former facilities near County Drain 30. The Scott Fetzer remedial investigation report estimated a groundwater flow velocity of 100 feet per year in the direction of the southwest. The weight of the evidence suggests, and the Court finds, that the average flow velocity is higher than the 40 feet per year assumed in Dr. Sklash's calculations.

Even assuming Dr. Sklash's flow velocity of 40 feet per year was reasonable, Dr. Stephens demonstrated that Dr. Sklash improperly calculated the "switch-back factor" to account for the percentage of time the groundwater is flowing in the southwesterly direction. Dr. Stephens demonstrated at trial that Dr. Sklash's method of simply dividing the travel time by three to account for the time the groundwater was traveling in the southwest direction was not proper because it did not account for the westerly component of the time the groundwater is traveling to the northwest. Dr. Stephens then demonstrated that, even using Dr. Sklash's groundwater velocity of 40 feet per year and his assumed start date of 1950, a release from the L.A. Darling facility would have traveled 1334 feet by the time ITT began to conduct its remedial investigation. Dr. Stephens explained that, with dispersion, even using Dr. Sklash's assumptions, TCE released from the former L.A. Darling facility had sufficient time to reach the former Bronson Reel facility. Because the only way to conclude that TCE from the L.A.

40

Darling facility did not reach the ITT facility requires relying on assumptions that Dr. Stephens demonstrated to be unsupported, the evidence is sufficient to conclude that TCE released from the former L.A. Darling facility has impacted the former Bronson Reel facility directly via contaminant migration through groundwater.

b. Industrial Sewer

The Court also rejects L.A. Darling's alternative contention that there is no evidence that it released any TCE to the western industrial sewer, which was the only alternative means by which TCE from the former L.A. Darling facility might have reached the former Bronson Reel facility.

L.A. Darling discharged into the western industrial sewer from 1939 to 1949. The western industrial sewer leaked at a number of places along Railroad Street through manholes and cracks. (Stephens Test.) The preponderance of the evidence supports a finding that L.A. Darling was using TCE in its operations and discharging wastewater containing TCE to the western industrial sewer during this period from 1939 to 1949. First, TCE began being used for industrial degreasing in the 1930s and its industrial use increased throughout the 1940s. (Stephens Test.) Second, elevated concentrations of TCE were detected in soils in the area where plating operations took place in the 1930s through 1950. (Avendt Test.; Ex. 6016, NBFF OU2 RI at 27, Fig. 1-3, & Drawing 3.) Third, TCE was detected in sediment samples taken from manholes in the western industrial sewer in a segment of the sewer used only by L.A. Darling.

The western industrial sewer along Railroad Street between North Matteson Street and North Walker Street was a 10-inch clay tile pipe running along the northern side of Railroad Street. (Ex. 6050, 1940 Bronson Industrial Sewer Tracings; Ex. 1109, McNamee Sewer Report; Well Test.; Stephens Test.) TCE was detected in sewer sediments in manhole L-8 at a concentration of 300 ug/kg; in manhole L-9 at a concentration of 660 ug/kg and in manhole L-17 at 7,100 ug/kg. (Ex. 6019, NBFF OU3 RI at 34, Table IX, & Fig. 19; Ex. 4100, Photo of NBIA with Sediment Samples From Sewers.) There is no credible evidence that any party other than L.A. Darling contributed wastewater to the western industrial sewer upstream of L-17. (Wells Test.; Stephens Test.)

Sediment samples collect by the MDEQ in 1998 from manholes L-8, L-9, and L-17 exhibited a different chemical fingerprint from the sediments collected from the industrial sewer at the L.A. Darling site. Dr. Sklash testified that this difference in chemical fingerprints in the sediments indicates that industrial sewer discharges from the L.A. Darling site did not cause the contaminants in the industrial sewer located on the north side of West Railroad Street. (Ex. 6007, 1998 MDEQ NBIA Tech Memo; Sklash Test.)

The Court is not persuaded by Dr. Sklash's argument. Only a 12-inch sewer line was discovered on the L.A. Darling property during its remedial investigation. (Avendt Test.) The 12-inch sewer line found on the L.A. Darling property is the eastern industrial sewer line. It appears that the western industrial sewer was removed at some point in the past from the L.A. Darling property, possibly when the 12-inch eastern industrial sewer was installed. (Stephens Test.) Therefore, sewer sediments tested during L.A. Darling's remedial

42

investigation do not appear to be representative of sediments deposited during the period of L.A. Darling's discharge to the western industrial sewer. (Stephens Test.) The weight of the evidence supports a finding that L.A. Darling discharged TCE to the western industrial sewer prior to 1949.

L.A. Darling also contends that even if TCE was released from the L.A. Darling site to the industrial sewer, ITT failed to establish that L.A. Darling was the owner or operator of the site at the time of such a release. Although there is evidence that the L.A. Darling former facility is contaminated, L.A. Darling contends that the sources and timing of those releases are largely unknown. Furthermore, after it ceased operations at the site in 1967, other parties operated at the site.

Although details regarding L.A. Darling's operations at the site are largely unknown, the Court is satisfied that ITT established that L.A. Darling was the owner or operator of the site at the time TCE was released both to the groundwater and to the industrial sewer. This finding is based on evidence of TCE in the industrial sewer upgradient of Scott Fetzer and the depth and distance traveled by the TCE released from the L.A. Darling site.

L.A. Darling has raised an additional argument relating to the industrial sewer. L.A. Darling contends that because the industrial sewer was designed, constructed, operated and maintained by the City of Bronson, even if there was a release of hazardous substances from the sewer, it was solely the responsibility of the City, and L.A. Darling would be entitled to a third-party defense to liability pursuant to CERCLA §107(b)(3).

The Court disagrees. CERCLA § 107(9)(3) does not provide L.A. Darling with a defense to liability. *See Frontier Commc'ns Corp. v. Barrett Paving Material, Inc.*, 631 F. Supp. 2d 110, 114 (D. Me. 2009) (holding that the discharge of hazardous substances to a sewer owned by the city fell "well within the confines of arranger liability - even after *Burlington*.")

Dr. Stephens and Dr. Wells both testified that the industrial sewer is a vehicle for release in the area of the former Bronson Reel facility. Both Scott Fetzer and L.A. Darling discharged to the sewer upstream from the Bronson Reel facility, and it is not possible to differentiate the upstream sources of any releases from the industrial sewer in the area of the former Bronson Reel facility. (Wells Test.) Accordingly, to the extent releases from the western industrial sewer impacted the former Bronson Reel facility, both Scott Fetzer and L.A. Darling are responsible. (Stephens Test.; Wells Test.)

## 2. Causation

The off-site Defendants contend that even if their contamination did impact the Bronson Reel site, their contamination was not a substantial factor in causing ITT to incur response costs. They contend that ITT's response costs were substantially caused by environmental conditions created by site-related activities, and that ITT has not incurred any additional response costs beyond those directly attributable to sources of contamination originating at the Bronson Reel site.

Neither CERCLA nor its legislative history provides any discussion about the causal nexus between releases and response costs. *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664,

670 (5th Cir. 1989). It appears that the causation inquiry necessarily differs from case to case depending upon the factual circumstances. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 670 (5th Cir. 1989) ( "[T]he question of whether a release has caused the incurrence of response costs should rest upon a factual inquiry into the circumstances of a case and the relevant factual inquiry should focus on whether the particular hazard justified any response actions."). In prior opinions in this case this Court rejected Defendants' contention that, in order to be liable, their releases must have been the "impetus" for the response costs. (Dkt. No. 223, 03/31/2009 Op. 7; Dkt. No. 293, 07/29/2009 Op. 6.) In a two-site case the plaintiff is not required to meet a "but for" rule of causation. *Artesian Water Co. v. Gov't of New Castle County*, 659 F. Supp. 1269, 1283 (D. Del. 1987). The issue is not whether the same investigation would have been required even without additional contamination from L.A. Darling or Scott Fetzer. Rather, where two or more causes have concurred to bring about an event, and any one of them, operating alone, would have been sufficient to cause the identical result, "the defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about." *Id.* (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 41, at 267 (5th ed. 1984)).

ITT, L.A. Darling, and Scott Fetzer's experts all agreed that when the EPA issued its Special Notice letter to ITT regarding NBFF OU1 in July 2001, the facts available provided a sufficient basis for the EPA to conclude that the Bronson Reel site was a potential source of TCE contamination: (1) the Bronson Reel site had been the site of decades of industrial operations involving the use of numerous hazardous materials including oils, metals and

volatile organic compounds; (2) prior government inspections had revealed that industrial wastes had not been properly managed at the site throughout its operational history, leading to a remediation of contaminated soils in 1988-90 that had left contaminated soils in place and left certain investigation and remediation activities uncompleted; (3) the 1988-90 investigation focused on oils and metals and did not include an investigation of the extent of volatile organic compound contamination such as TCE; (4) subsequent sampling by the MDEQ detected elevated levels of TCE in groundwater in the vicinity of the site.

Nevertheless, the existence of the TCE in the groundwater and in the industrial sewer was a substantial cause of ITT's response costs. This is reflected in ITT's AOC. ITT's AOC required ITT to focus on determining whether ITT was a source of TCE to the industrial sewer and to the groundwater plume beneath and west of its property. The Defendants' AOCs, by contrast, required them to "determine the nature and extent of contamination caused by the release or threatened release of hazardous substances, pollutants, or contaminants." (Ex. 6010, NBFF OU3 AOC; Ex. 5012, NBFF OU2 AOC.) There is no question that L.A. Darling and Scott Fetzer released significant amounts of TCE to the groundwater and to the industrial sewer. ITT has established that contamination from the L.A. Darling and Scott Fetzer sites was a "substantial factor" in causing ITT to incur response costs because their significant TCE releases that migrated toward the Bronson Reel site caused ITT to be suspected of being a possible source of the TCE to the industrial sewer and the groundwater plume. The Court accordingly concludes that L.A. Darling and Scott Fetzer's releases of TCE caused ITT to incur response costs.

### 3. **Liability of L.A. Darling and Scott Fetzer**

The evidence indicates that L.A. Darling operated NBFF OU2 and Scott Fetzer operated NBFF OU3, during the time hazardous substances, including TCE and metals, were disposed of at their sites and to the western industrial sewer. Both the L.A. Darling and Scott Fetzer sites and the western industrial sewer are "facilities" under CERCLA, 42 U.S.C. § 9601(9) (defining "facility" to include both a "pipe (including any pipe into a sewer or publicly owned treatment works)" and "any site or area" into which a hazardous substance has been disposed of, or placed, or otherwise come to be located). Accordingly, L.A. Darling and Scott Fetzer are responsible parties CERCLA § 107(a)(2) and CERCLA § 107(a)(3). The commingled contamination from L.A. Darling and Scott Fetzer has impacted the Bronson Reel site through migration in groundwater and from leakage from the western industrial sewer. This commingled contamination was a substantial factor in causing ITT to incur investigation costs which are the subject of this action. Accordingly, both Scott Fetzer and L.A. Darling are liable to ITT under § 107(a) for cost recovery.

### C. DIVISIBILITY

A party who is liable under § 107(a) is jointly and severally liable for the entire harm to the site, even though other parties may have contributed to the environmental harm. A defendant can, however, avoid joint and several liability if it can prove divisibility. *United States v. Twp. of Brighton*, 153 F.3d 307, 313, 319 (6th Cir. 1998). Divisibility is "a causation-based argument that the cleanup costs at a single CERCLA facility should be divided between it and another responsible party." *U.S. Bank*, 563 F.3d at 207 (citing

*Brighton*, 153 F.3d at 313). "Divisibility seeks to apportion liability based on relative contribution to harm, if such is reasonably ascertainable." *Brighton*, 153 F.3d at 320. Divisibility can be based on a variety of factors including volumetric, chronological, or geographic considerations, as well as contaminant-specific considerations. *Burlington N. & Santa Fe Ry. Co. v. United States*, — U.S. —, 129 S. Ct. 1870, 1883 (2009); *Brighton*, 153 F.3d at 319-20. "[A]pportionment is proper when 'there is a reasonable basis for determining the contribution of each cause to a single harm.'" *Burlington N. & Santa Fe Ry.*, 129 S. Ct. at 1881 (quoting Restatement (Second) of Torts § 433A(1)(b), p. 434 (1963-1964)). "CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists." *Id.* The party who invokes the doctrine of divisibility must prove that "(a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." *U.S. Bank*, 563 F.3d at 207 (quoting *Brighton*, 153 F.3d at 317-18).

Divisibility is a legal defense to joint and several liability. *Brighton*, 153 F.3d at 319. Divisibility concentrates solely on causation, and differs from the equitable allocation principles available to defendants under CERCLA's contribution provision. *Id.* Defendants have invoked the divisibility doctrine and accordingly bear the burden of proof on the divisibility defense.

## 1. <u>Divisibility as to BPP</u>

Royal Oak argues in favor of apportionment based on geographic divisibility and the type of contaminant.

<u>a. geographic divisibility</u>

Royal Oak seeks to limit its liability to the costs incurred by ITT in addressing releases in specific areas of the Site.

In *Brighton* the Sixth Circuit noted that "if Brighton Township could show . . . that its 'operating' activities were completely limited to a discrete and measurable section of the property, and that the releases onto or from that section represented a discrete and measurable harm, this would provide a reasonable basis for apportionment." 153 F.3d at 320. In *United States v. Capital Tax Corp.*, 545 F.3d 525 (7th Cir. 2008), the Seventh Circuit noted that with respect to a geographic divisibility defense, the following factors tend to preclude a finding of divisibility: (1) where the facility functioned as a "dynamic, unitary operation" in which materials were moved from location to location during the production process; (2) where there was a "migratory potential" and "actual migration" of the toxic substances; and (3) where there is commingling and cross-contamination. *Id*. at 535 (citations omitted).

BPP leased the entire 1.85 acre facility and conducted "operations" over the entire facility. Evidence does not support BPP's argument that its only releases of hazardous substances were contained in the vicinity of the metal chip bins. Rather, the evidence shows that there were other releases: (a) in the outdoor waste drum storage area on the north side of the Site; (b) releases of metal shavings scattered about the Site during transport; and (c) nine years of truck and vehicle traffic spreading existing contamination throughout the western yard area. BPP's expert, Venman, admitted that it would be impossible to differentiate BPP's releases of metals and waste oils from releases of similar materials by

another operator throughout the Site's history. BPP's operational activities were not "limited to a discrete and measurable section of the property," and do not fall within the parameters for geographic divisibility outlined in *Brighton*.

b. type of contaminant

Royal Oak also argues for divisibility based on the types of contaminants released at the Site. Royal Oak acknowledges that BPP used 1,1,1 TCA, naphtha, metals with chromium, and TPH. Nevertheless, Royal Oak contends that even if BPP discharged limited quantities of these substances at the site, BPP did not use TCE or PCE, and cannot be held responsible for causing a release of either of these contaminants.

Non-release may be a basis for divisibility. Nevertheless, BPP does not have a basis for divisibility based on the types of contaminants released. Prior to the investigation, there was a significant potential that in addition to metals and TPH, BPP also discharged VOCs, including 1,1,1 TCA, which was an occasional additive to its cutting oils, and naphtha solvent, which contained PCE, a precursor chemical to TCE prior to degradation. There is no reasonable basis for dividing the costs of investigating some VOCs from the cost of investigating other VOCs. The evidence also suggests that the Bronson Reel site was a likely source of another volatile organic compound, PCE, and that an investigating for PCE would have required the same level of effort as investigating for TCE. (Ex. 6015, SRI/SRA at 5-7, 5-8; Stephens Test.) Accordingly, Royal Oak's divisibility defense will be denied.

## 2. Divisibility as to L.A. Darling and Scott Fetzer

L.A. Darling and Scott Fetzer contend that their responsibility for ITT's response costs is divisible based on the type of contamination. They contend that they are only responsible for the costs of the investigation that relate to TCE, and that there is no basis for holding them responsible for the costs of investigating any other contaminants they released or that are present on the Bronson Reel site.

L.A. Darling and Scott Fetzer's experts testified that with respect to off-site sources, only TCE and no other contaminant, should have been investigated under the AOC, notwithstanding the fact that there may have been other contaminants that originated from off-site or from the industrial sewer, which impacted the Bronson Reel site. (Wells Test.; Sklash Test.)

The Court disagrees with their narrow interpretation of the AOC. Granted, the primary goal of ITT's AOC was to determine whether the Bronson Reel site was a source of TCE in groundwater. However, the AOC also required ITT to evaluate the risks and potential remedies for all on-site sourced contaminants. (Olmsted Test.) This requirement made it necessary for ITT to determine the source of all contaminants on the site, because unless it determined whether Bronson Reel was the source, it could not evaluate risks and remedies for contamination from the Bronson Reel site. (*Id.*) A source determination was also required to eliminate an investigation of the down gradient extent of contaminants originating from off-site or from the industrial sewer. (*Id.*)

Defendants note that all metals found in the groundwater at the former Bronson Reel Site are also found in on-site soils, that the metals in the groundwater are elevated above upgradient groundwater concentrations, and that the TPH detections appear to have originated from on-site sources. They also note that the EPA did not require any investigation of TPH from the Scott Fetzer or L.A. Darling sites during their respective remedial investigations. (Wells Test.; Avendt Test.)

The Court agrees with Defendants' contention that this data suggests that the majority of the metals and TPH at the Bronson Reel site likely originated from on-site operations. (Stephens Test.; Venman Test.; Ex. 1459; Ex. 1460; Ex. 1521). Nevertheless, there is no question that both Scott Fetzer and L.A. Darling released discharged metals and TPH, and there was evidence to suggest that those contaminants reached the Bronson Reel site. For example, there was evidence of elevated metals near the storm sewer leading from Scott Fetzer and running adjacent to the south and west boundaries of the Bronson Reel site. (Stephens Test.; Ex. 1470, Storm Sewer Samples, L-3, L-4, L-5, L-6; Ex. 1428, Map of NBIA Sewers.) There was evidence that Scott Fetzer released excessive quantities of soluble oil to the storm sewer. (Ex. 1370, 10/25/1968 MWRC letter to Douglas Mnfg.; Ex. 1371, 10/22/1968 MWRC Rpt.) There was also evidence that L.A. Darling discharged metal plating waste to the western industrial sewer and that high concentrations of metals have been detected in a section of the western industrial sewer used by L.A. Darling. (Ex. 1470, Storm Sewer Sample L-17; Ex. 1470, Sewer Map.)

The off-site Defendants have not met their burden of proving that they did not contribute contaminants other than TCE to the Bronson Reel site. Accordingly, their divisibility defense will be denied.

## V.

In order to recover damages under CERCLA § 107(a), ITT is required to show that its alleged response costs were "necessary" and "consistent with the national contingency plan [NCP]." 42 U.S.C. § 9607(a)(4)(B). "Costs are 'necessary' if incurred in response to a threat to human health or the environment." *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006). A response action is "consistent with the NCP" if the action is in "substantial compliance" with 40 C.F.R. § 300.700(c)(5)-(6), and results in a "CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). An "immaterial or insubstantial" deviation, however, will not result in a cleanup that is "not consistent" with the NCP. 40 C.F.R. § 300.700(c)(4).

When a private party undertakes environmental response activity pursuant to an administrative consent order entered into with the EPA, "the regulations establish an irrebuttable presumption that the private party's actions were consistent with the NCP." *Morrison Enters. v. McShares, Inc.*, 302 F.3d 1127, 1136-37 (10th Cir. 2002); 40 C.F.R. § 300.700(c)(3)(ii) ("Any response action carried out in compliance with the terms of . . . a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'"). "[C]osts will only be recoverable if they result from compliance with the plan's methods and criteria for determining appropriate, cost-effective

response actions." *United States v. E.I. Dupont De Nemours & Co. Inc.*, 432 F.3d 161, 178 (3rd Cir. 2005); *see also Johnson v. James Langley Operating Co.*, 226 F.3d 957, 964 (8th Cir. 2000) ("[T]esting methods that are scientifically deficient or unduly costly cannot be necessary."); *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1219 (3rd Cir. 1993) (noting that § 107(a)(4) prevents recovery of costs incurred in instituting a needless and expensive monitoring study); *Nw. Mut. Life Ins. Co. v. Atl. Research Corp.*, 847 F. Supp. 389, 401 (E.D. Va. 1994) ("Costs otherwise necessary and consistent with the NCP may nonetheless be unrecoverable if the steps taken were extravagant or otherwise unreasonably costly.").

The costs ITT seeks to recover in this litigation total $2,225,514.50, including $750,286.47 invoiced by Fletcher Driscoll & Associates ("Fletcher Driscoll"), $1,152,295.16 invoiced by Earth Tech, Inc., $240,711.57 in EPA oversight costs, and $82,021.00 invoiced by O'Brien & Gere and Arcadis, who supplied contract employees to work within ITT's office. (Ex. 1529, ITT Cost Summ.)

Defendants contend that many of the costs ITT seeks to recover in this case were not necessary or reasonable because: (a) they predated the Special Notice Letter for NBFF OU1, (b) they were incurred to avoid or shift liability, (c) they were duplicative, and (d) they were for work that exceeded the scope of the AOC.

## A. COSTS THAT PREDATE THE SPECIAL NOTICE LETTER

EPA agreed to the concept of the NBFF investigation in March 2001, and sent ITT the Special Notice letter relating to NBFF OU1 on July 5, 2001. (FPT F-40; Ex. 6124, EPA

letter of 03/03/2001.) ITT seeks to recover $177,850.81 in costs incurred prior to February 24, 2001, as reflected in the invoices dated October 13, 2000 through March 10, 2001. (Ex. 1529, ITT Cost Summary; Wells Test.; Wells Exs. 4, 5.)

Scott Fetzer's expert, Dr. Wells, analyzed ITT's invoices and determined that many charges on their face did not relate to NBFF OU1 activities; many of the work descriptions on the invoices contained insufficient information to determine whether the work was necessary, reasonable or even related to NBFF OU1; and significant amounts were expended for work that was performed before EPA initiated any action on NBFF OU1.

Project managers for Fletcher Driscoll admitted that certain costs reflected on the invoices prior to the NBFF OU1 special notice letter did not, in fact, relate to work specifically pertaining to the Site. (Lowell Dep. at 156-57; Mullin Dep. at 79-80.) Some of the work involved a Site Status Report that was used in the NBFF OU1 SRI/FFS. Other work related to NBIA OU1 and NBIA OU2. Ms. Olmsted testified that ITT deducted $7,420.50 from the invoice total of $185,271.31 for the unrelated NBIA work to arrive at the costs it is seeking to recover at trial. However, she admitted that after these deductions, there were still costs on these invoices that were not related to NBFF OU1, or that were so vague as to preclude her from determining whether they related to NBFF OU1. (Ex. 6083, Jan. 2001 invoice; Ex. 6095, Nov. 2000 invoice).

The invoices that predated the Special Notice letter included $60,000 for a Site Status Report. (Wells Test; Ex. 4095.) Dr. Wells acknowledged that it was reasonable to understand the regional context of the Site and to prepare a summary of past investigations.

Nevertheless, he testified that the amount spent on the report was unreasonable in light of the fact that Dr. Ray Avendt, L.A. Darling's expert witness, prepared a similar summary of site history for L.A. Darling for only a few thousand dollars.

The Court is satisfied that some of the costs ITT incurred prior to issuance of the Special Notice letter for NBFF OU1 were related to NBFF OU1 and ordinarily would be recoverable. For example, the background information developed for the Site Status Report was undoubtedly useful in conducting the remedial investigation. The AOC recognized that the Site Status Report summarized the significant work done under the direction of the MDNR. (Ex. 6013, ITT AOC at 2-3.) Nevertheless, ITT bears the burden to demonstrate that the costs it seeks to recover were necessary and consistent with the NCP. Where, as here, the Court is presented with costs that predate the issuance of the Special Notice letter, and where those costs were invoiced by an entity that was doing other work for ITT that was unrelated to NBFF OU1, ITT bears a particular duty to distinguish the costs that relate to NBFF OU1 from those that do not. Because ITT has admittedly included costs that do not relate to NBFF OU1, and because the vague work descriptions preclude the Court from determining whether other costs relate to NBFF OU1, the Court concludes that ITT has failed to meet its burden of establishing that the costs were reasonable and necessary. The Court will accordingly deduct from ITT's recoverable costs $177,850.81 in costs incurred prior to March 8, 2001.

**B. COSTS TO INVESTIGATE NON-VOCS AND OFF-SITE SOURCES**

Scott Fetzer and L.A. Darling object to the costs associated with investigating contaminants other than VOCs and determining the source of contaminants from off-site sources. They contend that these investigations went beyond the required scope of the AOC and were undertaken voluntarily and without any legal requirement or necessity. (Wells Test.; Sklash Test.) Defendants' argument derives from their interpretation of the scope of ITT's AOC.

Defendants' experts' opinion that ITT's AOC excluded any requirement to sample for contaminants other than VOCs is contrary to the plain language of the agreement and to standard industry practice when conducting a remedial investigation. The stated purpose of the ITT AOC was "to determine the nature of extent of TCE contamination in groundwater caused by the release or threatened release, if any, of TCE from OU1." (Ex. 6013, ITT AOC at p. 3). Thus, the AOC explicitly required ITT to determine the nature and extent of TCE contamination in groundwater caused by the release or threatened release TCE from the Bronson Reel Site. However, the AOC did not limit ITT's obligations to evaluations of TCE. The AOC also required ITT to provide a remediation plan to address "risks from OU1 related contamination" other than those caused by the industrial sewer or other off-site sources. The reference to "OU1 related contamination" is broader than just TCE. The ITT AOC indicated that the work should "focus" on whether the NBFF Site was a source of TCE, but it also required ITT to conduct a risk assessment of all NBFF Site-related contaminants. (ITT AOC 2-3; Olmsted Test.) In order to accomplish its tasks under the AOC, it was

reasonable for ITT to sample soil and groundwater for all relevant hazardous substances, including volatile organic compounds ("VOCs"), TPH, and metals.

The off-site Defendants also contend that ITT's investigation of off-site sources went far beyond what was required by the AOC, let alone what was reasonable, necessary and consistent with the NCP to characterize the TCE source at that Site. Scott Fetzer and L.A. Darling contend that the parties and the EPA understood that each of the three NBFF OUs would address only their own contributions and would pay for their own investigations and that regional groundwater issues and the industrial sewer would be addressed separately after the individual sites had been investigated.

Although the off-site Defendants' understanding was reasonable given their situations, ITT was in a different posture. Although ITT's AOC did not explicitly require ITT to delineate the extent of off-site sources, it did require ITT to evaluate the need for remediation "from OU1 related contamination other than that determined to be caused by the industrial sewer or other off-site sources. By implication, the AOC also required ITT to determine what contamination present on the Site was originating from off-site sources, and the industrial sewer. According to Olmsted, it was imperative for ITT to know what contamination was coming on to the Site from upgradient sources and the industrial sewer, so it did not have to "chase" and delineate that off-site contamination. (Olmsted Test.) ITT understood that even if its investigation did not indicate that the Bronson Reel site was a source of TCE to the regional groundwater plume, it would still have to prove that it was not a source of TCE. (Olmsted Test.) Because ITT was in a position where it had to prove a

negative, ITT's investigation was necessarily designed to be different from the investigations of L.A. Darling and Scott Fetzer. (Olmsted Test.) Moreover, even L.A. Darling's expert, Dr. Sklash, acknowledged that there was some value in examining the extent of TCE coming onto the site because it helps to understand the site in context. He also acknowledged that Dr. Avendt did upgradient sampling for L.A. Darling.

This Court has previously held that work upstream of a site may be reasonably necessary even though it is not directly required in an AOC. *See Kalamazoo River Study Group v. Eaton Corp.*, 258 F. Supp. 2d 736, 760 (W.D. Mich. 2002) (holding that although work conducted upstream was not within the AOC's definition of the "site," it was reasonably necessary to the plaintiff's understanding of the river and the continuing sources of PCBs to site, and was within the contemplation of the AOC). Because Bronson Reel was not a confirmed source of TCE, and because Bronson Reel was down gradient from known sources of TCE, the Court agrees with ITT's position that it was impossible to determine what conditions were directly caused by on-site activities, and what conditions required remediation, unless ITT also determined what contamination was caused by the industrial sewer or other off-site sources.

## C. COSTS TO AVOID OR SHIFT LIABILITY

Defendants contend that ITT cannot recover its investigation response costs to the extent that it utilized the Streamlined Remedial Investigation for litigation purposes as part of a strategy to tell its story and to build its claims and defenses far beyond the NBFF OU1 source investigation.

Litigation-related costs, including investigative activities, are generally not compensable under CERCLA. *Ellis v. Gallatin Steel* Co., 390 F.3d 461, 482 (6th Cir. 2004); *see also Young v. United States*, 394 F.3d 858, 865 (10th Cir. 2005) (holding that costs incurred solely for litigation are not recoverable); *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 461 (1st Cir. 1992) (holding that litigation related expenses, such as costs incurred exclusively in order to recover damages from polluters, are not compensable as § 107 response costs); *Krygoski Const. Co. v. City of Menominee*, 431 F. Supp. 2d 755, 765 (W.D. Mich. 2006) (Edgar, J.) ("[I]nvestigative activities that are litigation-related costs are not compensable under CERCLA."); *Champion Labs. Inc. v. Metex Corp.*, No. 02-5284, 2009 WL 2496888, at *22 (D.N.J. Aug. 13, 2009) (holding that costs incurred in order to avoid liability of cleanup and shift costs to other parties rather than to respond to threat from defendant's release were not recoverable).

Defendants contend that ITT undertook much of the investigation in this case as a vehicle for convincing the EPA that Bronson Reel was not a historical source of TCE to groundwater so that ITT could avoid liability for later remediation efforts. Defendants' contention finds support in the record. ITT has acknowledged that one of its goals in completing the Remedial Investigation activities was to prove to the EPA that it should not be held responsible for future area-wide work. (Olmsted Test.) Fletcher Driscoll, one of ITT's consultants, admitted that one its goals in re-writing ITT's SRI/SRA report was to demonstrate that the Bronson Reel site had never been a source of TCE to groundwater. (Mullin Dep. 56-57.) ITT was trying to convince the EPA that NBFF OU1 was not a

historical source of TCE to groundwater because ITT was "concerned about being named or otherwise retained as a PRP for any future regional groundwater investigation as a result of U.S. EPA interpretation." (Ex. 6080, ITT's 04/07/2005 letter to EPA, at 8.)

Defendants contend that ITT's desire to avoid future liability caused ITT to incur costs in excess of the costs necessary to achieve the limited goals of its AOC. Specifically, Defendants contend that many of ITT's costs to investigate off-site sources were not incurred to respond to the AOC, but to avoid or shift liability. For example, Defendants contend that ITT's voluntary addition of five upgradient monitoring locations is one example of costs incurred by ITT that were unnecessary to achieve the limited purposes of the AOC, but probably were motivated instead by ITT's desire to avoid future liability and shift costs to other parties. In addition, L.A. Darling contends that ITT voluntarily and unnecessarily expanded the scope of its obligations by extending its investigation beyond 30 feet below ground level (fbgl). According to Dr. Sklash, while testing above 30 fbgl may have been appropriate to identify on-site sources of TCE, testing below 30 fbgl was unnecessary to evaluate on-site sources of TCE and would be relevant, if at all, only with respect to off-site sources of contamination or in response to evidence of an on-site source migrating deep. (Sklash Test.)

ITT's admitted goal of avoiding future liability does not render its costs unnecessary or unreasonable. ITT was suspected of being a contributor to the TCE plume, but it was unknown whether ITT was in fact a contributor to the TCE plume. The risks of being found to be a source of TCE to the groundwater plume were great and justified a thorough

investigation. As the most down gradient of the three NBFF facilities, its investigation of off-site sources was relevant to the issue of whether ITT was a source of on-going TCE contamination. In addition, the EPA agreed that identification of upstream source areas were critical to the overall project. (Ex. 6124, EPA 03/08/2001 letter.)

Defendants contend that ITT's expenditures are similar to those that were disallowed in *Champion*. In *Champion*, the court found that Champion devoted its investigation to an unsuccessful attempt to demonstrate that a contaminant plume from Metex was the source of the contamination on Champion's site. 2009 WL 2496888, at *7. Because none of Champion's expenditures furthered a clean-up of the site or addressed contamination allegedly migrating onto the site, the court held that the costs expended by Champion to persuade the state environmental agency that Metex was the source of the contamination on the site and to obtain a "no further action" determination, were not "necessary" to contain or clean up contaminants, and were not recoverable. *Champion*, 2009 WL 2496888, at *22.

Unlike the situation in *Champion*, in this case ITT incurred its costs to successfully demonstrate that ITT was not a source of the TCE contaminant plume that is beneath and west of the Bronson Reel site. Even though some of ITT's costs were incurred in part as a defensive strategy to eliminate Bronson Reel from further consideration as a source of the TCEs to the plume, ITT's investigation was relevant and responsive to the EPA's interest in determining the sources of the contaminants. Furthermore, the results of ITT's investigation will be useful to the overall effort to address the contaminant plume in the NBIA. *See Key Tronic Corp. v. United States*, 511 U.S. 809, 820 (1994) (noting that activities designed to

benefit the entire cleanup effort were recoverable because they served a statutory purpose apart from the reallocation of costs). The Court is satisfied that these costs were not unnecessary or unreasonable simply because they also served a purpose in avoiding liability.

Moreover, the scope of the work performed by ITT is attributable, in part, to the MDEQ's requirements. Although ITT had originally negotiated a more limited investigation with the EPA, the MDEQ requested a more thorough investigation and the EPA followed the MDEQ's lead. For example, in its comments to ITT's proposed SRI/FSS, the MDEQ requested analysis for metals and TPH in addition to VOCs in all sample locations, and complete vertical aquifer profiling. The MDEQ also expanded the number of geoprobes significantly, including additional upgradient and down gradient sampling. The language of the AOC was general enough to support the MDEQ's requests, notwithstanding ITT's previous discussion of a more limited investigation with EPA. (Olmsted Test.; Ex. 6073, 02/24/2003 note from EPA forwarding MDEQ's 1/31/03 memo.; Ex. 4094, MDEQ letter of 03/03/2003.)

In addition, after completing its Phase I groundwater monitoring which showed that TCE concentrations increased with depth, ITT was satisfied that the data indicated an off-site source of TCE and revealed no information consistent with a conclusion that the Bronson Reel site was a source of TCE. (Olmsted Test.) However, the EPA and MDEQ required additional testing to determine whether there could be a narrow plume emanating from the Site that might be the source of the TCE previously found at the GPW-4 sampling location. In the Phase II investigation, ITT added vertical aquifer profiling at seven locations, ETBR

17-23.  Four of these locations (ETBR 17, 21-23) were in areas  identified by the agencies at GPW-4, near the storage area and to the east of the main storage building, as potential source areas to GPW-4.  ITT proposed an additional three locations, ETBR 18-20, to determine concentrations of contaminants moving onto the Site upgradient of the sewers. (Ex. 6132, Earth Tech's 12/8/03 letter to EPA.)

The Court is satisfied that the costs to which Defendants object to were necessary and reasonable, and were not incurred solely for litigation purposes.  Accordingly, the Court declines Defendants' invitation to exclude costs allegedly incurred to avoid or shift liability.

## D.  DUPLICATIVE COSTS

Defendants contend that ITT's costs failed to comport with the NCP because ITT's own consultants routinely billed ITT to do work that had either already been done by another consultant, to provide additional layers of project management, or that were completely unnecessary with respect to the Streamlined Remedial Investigation.

To qualify as "necessary," the costs do not have to be the least expensive means available.  Nevertheless, costs will be denied when they "duplicative of other costs, wasteful, or otherwise unnecessary to address the hazardous substances at issue."  *Waste Mgmt. of Alameda County, Inc. v. East Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001).  Necessary costs include not only the cost of actual cleanup, but also include costs for investigation, planning, and remedial design.  *City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1091 (D. Kan. 2003); *Waste Mgmt. of Alameda County, Inc.*, 135 F. Supp. 2d at 1099.

Defendants contend that the record in this case is replete with examples of duplicative, wasteful, extravagant and unreasonably costly actions taken by ITT. They object, in particular, to the following charges: Fletcher Driscoll's $110,500 charge for the Work Plan in addition to Earth Tech's $110,000 charge for the same Work Plan; Earth Tech's $295,000 charge for office work during the field work portion of the investigation; Fletcher Driscoll's $152,681 charge for oversight of Earth Tech's field work, without ever appearing at the site; Fletcher Driscoll's $128,863 charge to re-write Earth Tech's draft of the SRI/SRA; and project management charges of $30,000 by O'Brien and Gere and $30,000 by Arcadis in addition to project management services provided by ITT, Fletcher Driscoll, and Earth Tech. (Ex. 4098, Chart of ITT's Costs for Overlapping Consultants.)

Defendants object to ITT's costs as unreasonable in part because the costs billed by ITT's consultants were far higher than those paid to Defendants' consultants. By way of comparison, Dr. Sklash noted that L.A. Darling's remedial investigation, including labwork, totaled approximately $440,000 (including $20,000 related to an interim removal action), plus EPA oversight costs of approximately $200,000. (Avendt Test.; Sklash Test.; Ex. 5038.) Dr. Sklash opined that ITT's Streamlined Remedial Investigation should not have cost more than $514,000. (Ex. 5038, Chart of Estimated Reasoanble and Necessary SRI Costs.)

Defendants also object to ITT's costs as unreasonable in part because: ITT did not submit any aspect of the Streamlined Remedial Investigation for competitive bidding; ITT always paid its consultants' invoices for this matter in full, without any correction or

deduction of charges; neither consultant was based in Michigan; and ITT failed to use a phased approach to its field work. (Sklash Test.)

Costs for environmental consultants may be recoverable under CERCLA, even if those costs are not the least expensive method of response. *See Basic Mgmt. Inc. v. United States*, 569 F. Supp. 2d 1106, 1120-21 (D. Nev. 2008) (finding "no authority supporting the [defendant's] argument that the term 'necessary' require[d] that the least expensive clean-up option be used for the site"). Moreover, it is not necessarily unreasonable to hire a second consultant to review and check the work of a first consultant. In *Norfolk Southern Railway Co. v. Gee Co.*, No. 98 C 1619, 2002 WL 31163777 (N.D. Ill. Sept. 30, 2002), the court rejected the defendant's challenge to the sum paid to a second consultant as duplicative. *Id.* at *36. The court found that even if hindsight suggested that the second opinion was unnecessary, it was not unreasonable, and was in fact prudent, to consider the opinions of more than one environmental consultant before engaging in an extensive and expensive clean-up effort. *Id.*

Olmsted has been employed by ITT Corporation for more than twenty years, and is responsible for managing ITT's legacy sites. Olmsted's job responsibilities include investigations, risk assessments, feasibility studies, and evaluation of remedial alternatives under CERCLA or state programs; hiring and managing consultants; reporting to agencies and ITT management; budgeting and managing costs in investigations and remedial projects. (Olmsted Test.) Olmsted explained that the two consultants hired by ITT had expertise in different areas and were hired to do different work. She hired Fletcher Driscoll to direct and

oversee the investigation and to serve as the project manager, and she hired Earth Tech to prepare a work plan, to perform the field work and analysis, and to draft the initial reports due under the AOC.  The work of the two consultants was not duplicative.  (Haramut Dep. 183, 229; Lowell Dep, 16-17; Mullin Dep. 98.)  Olmsted had worked with both companies in the past, and she had confidence in their work.  (Olmsted Test.)  ITT did not request competitive bidding on the work because it had Master Service Agreements with both firms that entitled ITT to preferred rates.  (Olmsted Test.)

ITT's goal was to have its Remedial Investigation and Feasibility Study ("RI/FS") completed as efficiently as possible, and with minimal revisions.  (Olmsted Test.)  ITT was able to complete the RI/FS with only one round of comments from the EPA, and completed the process faster than either Scott Fetzer or L.A. Darling.  Although Olmsted was disappointed that the Earth Tech SRI report had to be rewritten, she believed that it was necessary to pay Fletcher Driscoll to rewrite the report so that she could submit a report that she had confidence in and that best presented ITT's position.

The fact that ITT's costs exceeded the costs paid by Scott Fetzer and L.A. Darling does not render ITT's costs wasteful, extravagant, or unreasonable.  Because ITT had no clear history of TCE use, because it had already done a substantial remediation of the property, and because it was down gradient of known sources of TCE, its AOC necessarily called for a different kind of investigation than was done at Scott Fetzer and L.A. Darling. Moreover, although a phased or sequenced approach may have some cost advantages, field

costs may also be reduced by completing all sampling efforts during one field mobilization. (Ex. 6132, 12/08/2003 Earth Tech letter to EPA.)

ITT used reasonable business judgment in hiring and paying its consultants, and the work performed and the fees charged by the consultants were not unduly duplicative, wasteful, extravagant or unreasonable.

## E.  RECOVERABLE RESPONSE COSTS

ITT claims to have incurred response costs of $2,225,514.50.  For the reasons stated above, $177,850.81 shall be deducted from ITT's claim for costs that predated teh Special Notice letter.  The Court concludes that ITT has established that it incurred recoverable response costs in the amount of $2,047,663.69.

## VI.

ITT has entered into settlements with two potentially responsible parties.  In March 2007, ITT entered into a Settlement Agreement with the Elmer Houghton Trust and its trustee, Century Bank and Trust (the "Houghton Defendants"), in which ITT agreed to dismiss all claims against the Houghton Defendants in return for a cash payment of $145,000.  (Dkt. No. 111, 06/30/08 Stip. & Order Dismissing Claims Against Houghton Defs.; Ex. 1418, Settlement Agreement.)  In August 2009, ITT entered into a Settlement Agreement with (New) BSI, in which ITT agreed to dismiss its CERCLA § 107(a) claims against (New) BSI in exchange for payment of $95,000 and (New) BSI's agreement to implement a restrictive covenant or other institutional control(s) relative to NBFF OU1

consistent with the NBFF OU1 ROD. (Dkt. No. 327, Stip. & Order Dismissing Claims against (New) BSI; Ex. 1530, Settlement Agreement.)

The parties are in agreement that ITT's claim should be reduced by the entire amount of the (New) BSI settlement of $95,000. However, there is a dispute as to how much of the Houghton settlement should be deducted from ITT's claim. Defendants contend that ITT's claim should be reduced by the entire amount of the Houghton settlement of $145,000. ITT contends that only half of the settlement with the Houghton Defendants ($72,500) should be applied to this action because it applied 50% of the settlement to ITT's NBIA OU1 response costs, and 50% to ITT's NBFF OU1 (Bronson Reel site) costs.

In resolving this dispute, the Court notes that ITT's settlement with the Houghton Defendants applied to both the NBIA OU1 and NBFF OU1, and was entered into prior to this Court's dismissal of ITT's NBIA OU1 claims following remand. (Dkt. No. 224, 03/31/2009 Order.) Because the settlement resolved a disputed claim with respect to the NBIA OU1 site, the Court rejects Defendants' invitation to reduce ITT's claim in this action by the entire amount of ITT's settlement with the Houghton Defendants. However, the Court also rejects ITT's invitation to apply a 50/50 allocation of the settlement amount because the NBIA OU1 claims was dismissed as untimely, and a 50/50 allocation would not fairly reflect the relative degree of dispute with respect to the NBIA OU1 and NBFF OU1 sites. The Court, in an exercise of its discretion, will allocate $45,000 of the settlement to the NBIA OU1 claim and $100,000 to the NBFF OU1 claim that is at issue in this case. The Court will accordingly

reduce ITT's recoverable costs by $195,000 ($100,000 + $95,000) to account for the settlements it entered into with the Houghton Defendants and (New) BSI.

The Court concludes that ITT has established by a preponderance of the evidence that Defendants Royal Oak, Scott Fetzer, and L.A. Darling, are jointly and severally liable to ITT in the amount of $1,852,663.69 ($2,047,663.69 - $195,000.00).

## VII.

In response to ITT's claim for cost-recovery under CERCLA § 107(a), Defendants have filed claims against ITT and each other for contribution. A defendant in a § 107(a) suit can blunt any inequitable distribution of costs by filing a § 113(f) counterclaim. *United States v. Atl. Research Corp.*, 551 U.S. 128, 140 (2007). "[L]iability under § 113 is not joint and several, but several only." *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000). The resolution of a § 113(f) counter-claim necessitates the equitable apportionment of costs among the liable parties, including the party that filed the § 107(a) action. *Atl. Research*, 551 U.S. at 140. Accordingly, as a result of the various Cross-Claims, Counter-Claims and Third-Party Complaints that have been filed, this case is effectively a contribution suit between and among potentially responsible parties.

### A. ITT's LIABILITY

Defendant's contribution claims against ITT require the Court to consider the liability of ITT and the settling parties. The liability standard for contribution claims is the same as for cost recovery claims. *Menasha*, 228 F.3d at 653. The Court has already determined that the Bronson Reel site is a "facility," that there has been a release of a hazardous substance

70

at the facility, and that the releases have caused Defendants to incur response costs. That leaves the fourth element, i.e., whether ITT is a potentially responsible party. *See Regional Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006). As previously noted, a potentially responsible party includes any person who, at the time of disposal of a hazardous substance, owned or operated any facility at which such hazardous substances were disposed. 42 U.S.C. § 9607(a)(2).

Higbie Manufacturing, Inc., or its predecessors, including Bronson Reel Company, operated at the Bronson Reel site for approximately thirty-four years, from 1929 through 1963. There were releases of hazardous substances at the Bronson Reel site during this period of time. (See Part III(A) above.) Accordingly, Higbie Manufacturing, Inc., is potentially responsible as an operator at the site. Higbie Manufacturing, Inc. merged into ITT Higbie Manufacturing Inc. and became the successor in interest to the liabilities of Higbie Manufacturing, Inc. at the former Bronson Reel facility. *See Anspec Co., Inc. v. Johnson Controls, Inc.*, 922 F.2d 1240 (6th Cir. 1990) (company into which former operator of facility had merged was liable under CERCLA even though company had sold the property at issue prior to the merger). By stipulation, ITT has accepted responsibility for the liabilities of ITT Higbie Manufacturing Company with respect to the former Bronson Reel site. Accordingly, ITT is liable as an operator at the Bronson Reel site from 1929 through April 1963.

## B. SETTLING PARTIES' LIABILITY

The evidence also demonstrates that hazardous substances were released at the former Bronson Reel facility during the period of time that (Old) BSI and (New) BSI operated at the site. (See Part III(A) above.)

ITT contends that the settling parties' fair share of response costs is equal to no more than their respective settlement payments. Defendants, on the other hand, contend that pursuant to the stipulations and orders to dismiss, ITT's recovery from the non-settling parties should be reduced by the settling parties' equitable shares, rather than the amount of the settlement, and that as a practical matter, therefore, ITT has assumed the settling parties' equitable share for purposes of equitable allocation.

The stipulations and orders to dismiss the Houghton Defendants and (New) BSI both provided that the reduction in any award to ITT against any of the remaining defendants resulting from the settlement should be determined through the application of the Uniform Comparative Fault Act ("UCFA"). (Dkt. No. 111, ¶ 3) (Dkt. No. 327, ¶ 2.) Section 6 of the UCFA provides:

> A release, covenant not to sue, or similar agreement entered into between a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other person liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation. . . .

*Comerica Bank-Detroit v. Allen Indus., Inc.*, 769 F. Supp. 1408, 1414 (E.D. Mich. 1991).

"Under the Uniform Act, then, the claimant bears the risk that the ultimate liability of the

settling defendant may exceed the settlement amount." *Id.*; *see also Adobe Lumber, Inc. v. F. Warren Hellman*, No. CIV 05-1510, 2009 WL 256553, at *3 (E.D. Cal. Feb. 3, 2009) ("The proportionate share approach, embodied in the Uniform Comparative Fault Act (UCFA), calls for the reduction of the nonsettling defendants' liability by the equitable share of the settling party's obligation.").

If the settling parties' fair share of response costs is not limited to the amount of their respective settlement payments, then ITT argues that any excess liability of (Old) BSI and (New) BSI should be treated as "orphan shares."

"Orphan shares" refer to response costs that are "attributable to bankrupt or financially insolvent PRPs." *Charter Twp. of Oshtemo v. Am. Cyanamid Co.*, 898 F. Supp. 506, 508 (W.D. Mich. 1995) (Enslen, C.J.). Orphan shares are "apportioned among all of the solvent PRPs that are parties in this litigation . . . in amounts corresponding to their relative equitable responsibility for any indivisible harm for which joint and several liability otherwise applies." *Id.* at 509.

ITT contends that (Old) BSI is an orphan party because it is a dissolved corporation. ITT further contends that its settlement with the Houghton Defendants did not purport to resolve the liability of (Old) BSI because the settlement was only reached with Elmer Houghton's trust and trustee, and the Houghton Defendants had potentially viable defenses based on Mr. Houghton's actions having been taken on behalf of the corporations rather than in his individual capacity and based on the statute of limitations applicable to trusts. ITT contends that (New) BSI is an orphan party because, although it is not a dissolved

corporation, it has no assets other than the Bronson Reel property, which likely has a negative value.

Because ITT's settlements resolved issues of disputed liability with respect to (Old) BSI and (New) BSI, ITT has not established that (Old) BSI and (New) BSI should be treated as orphan parties. The Court concludes that, in accordance with the terms of the settlement agreements and the UCFA, ITT is responsible for any amount by which (Old) BSI and Bronson Products' liability exceeds the settlement amount of $100,000, and by which (New) BSI's liability exceeds the settlement amount of $95,000. Accordingly, there is no remaining "orphan" share to be divided among the parties to this action.

Because ITT has assumed through settlement the equitable shares of responsibility attributed to (Old) Bronson Specialities, Inc., which operated at the Bronson Reel facility from 1963 through 1979, and (New) Bronson Specialities, Inc., which operated at the Bronson Reel site from 1979 to 1984, and owned the Bronson Reel property from 1979 to the present, ITT is liable for contribution based on releases from 1929 to the present.

## C. EQUITABLE ALLOCATION OF RESPONSIBILITY

The parties' contribution claims require the Court to make an equitable allocation of responsibility between and among the liable parties. In resolving a contribution claim, the Court may allocate response costs among the liable parties using such equitable factors as the Court determines are appropriate. 42 U.S.C. § 9613(f). The Court may consider any factor it deems appropriate in the interest of justice. *Kalamazoo River Study Group v. Eaton Corp.*, 258 F. Supp. 2d 736, 753 (W.D. Mich. 2002). The "Gore factors," are a nonexclusive

list of equitable factors often considered by the courts.  *Id*.  The "Gore factors" are (1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with the federal, state or local officials to prevent any harm to the public health or environment.  *Brighton*, 153 F.3d at 318-19; *Kalamazoo River Study Group v. Rockwell Int'l Corp*., 258 F. Supp. 2d 736 (W.D. Mich. 2002).  The Gore factors provide the best framework for determining the parties' contributions, even in an investigation case such as this.

The first Gore factor is the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished.

While the evidence suggests that both Scott Fetzer and L.A. Darling likely contributed some metals and oils to the site, the extent of such contributions was minimal compared to the on-site contributions.  The historical manufacturing operations at the former Bronson Reel facility contributed to significant releases of metals and oils.  On the other hand, Scott Fetzer and L.A. Darling bear most of the responsibility for the TCE in the area.  TCE was used extensively by Scott Fetzer and L.A. Darling for many years, and has caused significant contamination of the soils and groundwater.  By contrast, TCE was used for only

a short period of time at the Bronson Reel site, was used in limited quantities, and has left little evidence of releases.

The second Gore factor is the amount of the hazardous waste involved. Defendants contend that any attempt to allocate costs based on relative contributions of contamination by each of the liable parties will fall short due to the lack of any reliable evidence of the amount of the contaminants at the NBFF OU1 site contributed by each of the parties. The Court agrees that there are immense gaps in the evidence concerning the comparative releases by each of the parties. There was little evidence regarding the amount of hazardous substances used by the various operations, much less the amount of hazardous substances released. Nevertheless, the Court can draw some general inferences about the quantity of contaminants contributed based on other known factors.

One such factor is the quantity of contaminants found on-site at each facility. The extent of TCE contamination at the Scott Fetzer and L.A. Darling sites was exponentially greater than that found at or near the Bronson Reel site, leading to an inference that Scott Fetzer and L.A. Darling are responsible for the vast majority of the TCE plume.

Dr. Sklash and Dr. Wells testified that because the soils excavated at Bronson Reel in 1988-90 were not fully characterized for VOCs such as TCE, it is not possible to determine whether there may have been greater concentrations of TCE in the soils at the Bronson Reel site prior to the excavation work. (Sklash Test.; Wells Test.) To the extent Dr. Sklash and Dr. Wells are suggesting that Bronson Reel may have released more significant quantities of TCE, the Court does not find this testimony persuasive. Had there been

significant TCE contamination at the Bronson Reel site, it would have been evident in the shallow groundwater. (Stephens Test.) The evidence reveals an absence of TCE in significant concentrations in the shallowest groundwater readings and higher concentrations of TCE at depth at the Bronson Reel Site. The detection of TCE at depth, but not in shallow groundwater cannot be explained unless the TCE came from off-site. Accordingly, there is no basis for challenging ITT's determination that the Bronson Reel site was not a significant source of TCE.

Another factor is length of time the various operations were in business. Scott Fetzer was in operation from 1910 to 1984, a period of 74 years. L.A. Darling was in operation from 1909 to 1967, a period of 58 years. ITT bears responsibility for operations at the Bronson Reel site from 1929 to 1984, a period of 55 years. Royal Oak operated at the Bronson Reel site from 1984 to 1994, a period of 10 years.

A third factor that bears on the quantity of contaminants contributed is the recency of operations. The record reflects that industrial operations have generally become cleaner over time as environmental awareness has increased and regulations on discharges have tightened. Without considering the amount of TCE used at the various facilities, the Court finds that based simply on the fact that Scott Fetzer and L.A. Darling used TCE for a significant period of time prior to 1950, while TCE was not used at the Bronson Reel site until the 1960s, supports an inference that Scott Fetzer and L.A. Darling likely released a higher portion of the TCE used based upon the lack of environmental care exercised by industry in general in earlier years.

The recency of operations is also a relevant factor with respect to Royal Oak. Although Royal Oak is responsible for releases of oil and metals at the Bronson Reel site, it is the most recent operator at the site, and its practices were cleaner than those of its predecessors at the site.

The third Gore factor is the degree of toxicity of the hazardous waste involved. In this case there is no question that TCE is the substance of greatest environmental concern based upon its toxicity.

A TCE degreaser was used at Bronson Reel for approximately ten years, between 1960 and 1970. Scott Fetzer used TCE in its operations for a period in excess of 35 years from at least 1945 until 1980. L.A. Darling began using TCE for a period in excess of 28 years, from some time before 1949, as evidenced by the significant TCE detection in the western industrial sewer and the contamination on the north part of its property, until 1967. Scott Fetzer and L.A. Darling are clearly the most significant sources of TCE to the groundwater plume.

The fourth and fifth Gore factors are the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste, and the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste. Neither of these factors distinguish any of the parties. All of the parties conducted industrial operations, all generated and disposed of hazardous wastes, and none of the parties was exemplary in terms of the degree of care exercised.

The sixth Gore factor is the degree of cooperation by the parties with the federal, state or local officials to prevent any harm to the public health or environment. The off-site Defendants note that during the same time ITT was investigating NBFF OU1, they were themselves conducting investigations of their own former facilities under agreements with EPA. They contend that in the context of the EPA's phased approach to remediating the NBIA OU2, which called for parallel and coordinated investigations of the sources of contamination originating at each of the three "former facilities," it would be most equitable for the former owners and operators of the Bronson Reel site itself to bear the substantial portion of recoverable costs for investigation of the Bronson Reel site as opposed to sources of off-site contamination, such as Scott Fetzer and L.A. Darling.

This argument is not persuasive. Although each of the three facilities was required to undertake simultaneous investigations, it was the TCE in the groundwater rather than the remaining contamination at the Bronson Reel site that was the most substantial trigger for the NBFF investigations. Moreover, TCE was discovered in the groundwater as early as 1979, yet there is no evidence that Scott Fetzer or L.A. Darling engaged in any significant efforts to prevent on-going contamination from their individual sites prior to receiving the Special Notice letter regarding the NBFF sites in 2001. ITT, by contrast, engaged in a substantial remediation of the property in 1988-90.

The Court must now apply these factors to make an equitable allocation of responsibility between and among the parties.

Defendants Scott Fetzer and L.A. Darling contend that because this case involves investigation rather than remediation of any contamination, the second and third Gore factors, mass and toxicity, should be given little weight. Defendants contend that mass and toxicity are not relevant to an equitable allocation of response costs because the exceedances of relevant criteria at the Bronson Reel Site were sufficient to require investigation. They contend that given the on-site focus of the investigation requried by ITT's AOC, the bulk of ITT's costs should be allocated among the former owners and operators of the site.

The Court disagrees. Contrary to Defendants' assertions, the mass and toxicity of the contaminants is of great relevance. Although the mass and toxicity of contamination is immaterial to the cost of investigation as opposed to remediation, it was the TCE plume and the need to determine the sources of TCE to the plume that prompted the investigation. In other words, the investigation was required because of the mass and the toxicity of the TCE released by Scott Fetzer and L.A. Darling. Because the TCE plume was the driving factor for the investigation, it would not be equitable to hold the on-site parties liable for a significant portion of the costs of an investigation that would not have been triggered in the absence of the TCE plume created by the off-site Defendants.

Defendants suggest that ITT's costs should be divided by contaminant. L.A. Darling and Scott Fetzer contend that they should not be held responsible for any costs associated with investigating metals and TPH. ITT's bills are not divided up by contaminant. Nevertheless, Dr. Wells testified that 42% of ITT's soil sampling and 77% of ITT's groundwater sampling was not related to TCE. (Wells Test; Ex. 4099, Chart of Sampling

Unrelated to TCE.)  Dr. Sklash testified that only 25% of ITT's samples tested for VOCs including TCE. (Sklash Test.; Ex. 5037, Chart Apportioning Costs by Contaminant.)

Clearly, the off-site Defendants bear little responsibility for metals and TPH on the Bronson Reel property compared to the on-site operators.  On the other hand, the Court is not inclined to simply divide ITT's costs by the number of samples tested for the various contaminants.  Such a division does not take into account what triggered the investigation, the expense of originating the tests, and relative expenses of the analyses for the various contaminants.

The Court is satisfied that the most equitable allocation is to hold the on-site operators liable for metals and TPH, but to place a premium on the off-site operators whose release of TCE was most responsible for the investigation.  The Court concludes that an equitable allocation in this case is to hold the off-site Defendants, Scott Fetzer and L.A. Darling, liable for 60% of ITT's recoverable response costs, and to hold the on-site parties, ITT and Royal Oak, liable for the remaining 40% of the costs.

Both L.A. Darling and Scott Fetzer have impacted the Bronson Reel site, and there is not a sufficient basis for distinguishing the contamination from either of these two off-site Defendants.  (Stephens Test.; Wells Test.)  Because there is no reliable evidence regarding the relative contribution of contamination by Scott Fetzer and L.A. Darling, and because the amount of contamination is immaterial to the cost of investigation as opposed to remediation, any recovery by ITT associated with contamination not originating at the site itself should be divided equally between L.A. Darling and Scott Fetzer.  Accordingly, L.A. Darling and

Scott Fetzer will each be held liable for $555,799.11, which represents 30% of ITT's recoverable costs (30% x $1,852,663.69).

With respect to the on-site parties, ITT should bear the majority of costs. While Royal Oak is responsible for some contamination at the Bronson Reel site, Royal Oak was only on the property for ten years, from 1984 to 1994, it did not use TCE, and it ran a cleaner operation than its predecessors at the site. The majority of the contamination at the site resulted from the operations of earlier tenants at the site. The Court concludes that Royal Oak should bear the smallest percentage of the costs allocated to on-site parties. The remaining 40% of recoverable response costs for which the on-site parties are liable will be allocated as follows: 38% to ITT and 2% to Royal Oak. Accordingly, ITT will be liable for $704,012.20, which represents 38 % of its recoverable costs (38% x $1,852,663.69), and Royal Oak will be liable for $37,053.27, which represents 2% of ITT's recoverable costs (2% x $1,852,663.69).

## D.  DEFENDANTS' CONTRIBUTION CLAIMS AGAINST EACH OTHER

The Defendants have filed contribution actions against each other in the event they are held liable for more than their fair and equitable share of ITT's costs relating to NBFF OU1. "[A] PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties." *Atl. Research*, 551 U.S. at 139. Under the contribution analysis above, the Court is holding each party liable only for its respective "fair share" of ITT's response costs.  Because L.A. Darling, Scott Fetzer and Royal Oak are liable to ITT only for their fair-and-several shares of liability, they do not have

any additional claims against each other for contribution to recover for the liability they incur for ITT's response costs. *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1035 (E.D. Cal. 2002). Accordingly, there is no basis for L.A. Darling, Scott Fetzer, and Royal Oak to recover on their third-party, counterclaims and cross-claims against each other.

## E. PART 201

ITT also has a claim for cost recovery under the Michigan Natural Resources and Environmental Protection Act (NREPA), M.C.L. § 324.101, et seq. The NREPA Part 201 cost-recovery provision is patterned after CERCLA and is therefore construed in accordance with CERCLA. *City of Detroit v. Simon*, 247 F.3d 619, 630 (6th Cir. 2001); *Krygoski*, 431 F. Supp. 2d at 767; *Kelley ex rel. Mich. Natural Res. Comm'n v. Tiscornia*, 827 F. Supp. 1315, 1318 n.1 (W.D. Mich. 1993). As such, the analysis set forth above regarding ITT's CERCLA cost-recovery claims applies with equal force to its claims under NREPA. *See Freeport-McMoran Res. Partners Ltd. P'ship v. BB-Paint Corp.*, 56 F. Supp. 2d 823, 838 n.7 (E.D. Mich. 1999) (citing *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 3 F. Supp. 2d 799, 805 (W.D. Mich. 1998), *aff'd*, 171 F.3d 1065 (6th Cir. 1999)).

## VIII.

In accordance with this opinion, the Court will enter a judgment in favor of ITT and against Royal Oak in the amount of $37,053.27, against Scott Fetzer in the amount of $555,799.11, and against L.A. Darling in the amount of $555,799.11.

Dated: <u>March 24, 2010</u>                    /s/ Robert Holmes Bell
                                        ROBERT HOLMES BELL
                                        UNITED STATES DISTRICT JUDGE